## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

| | |
|---|---|
| 1ST SGT SCOTT JOHNSON, LINDSEY JOHNSON, SSGT GARRETT BURN, KALIE BURN, CPL WILLIAM LEWIS, LAKIN LEWIS, on their own behalf and on behalf of others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| LEND LEASE (US) PUBLIC PARTNERSHIPS LLC, LEND LEASE (US) PUBLIC PARTNERSHIPS HOLDINGS LLC, AMCC MANAGING MEMBER LLC, ATLANTIC MARINE CORPS COMMUNITIES LLC, AMCC PROPERTY MANAGEMENT LLC, ATLANTIC MARINE CORPS COMMUNITIES PROPERTY MANAGEMENT LLC, WINN MANAGEMENT GROUP LLC, and WR SOUTH LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiffs, First Sergeant Scott Johnson, his spouse Lindsey Johnson, Staff Sergeant Garrett Burn, his spouse Kalie Burn, Corporal William Lewis, and his spouse Lakin Lewis, bringing this action on their own behalf and on behalf of a class of others similarly situated, by their undersigned counsel, for their Complaint against the Defendants, Lend Lease (US) Public Partnerships LLC, Lend Lease (US) Public Partnerships Holdings LLC, AMCC Managing Member LLC, Atlantic Marine Corps Communities LLC, AMCC Property Management LLC, Atlantic Marine Corps Communities Property Management LLC, Winn Management Group LLC, and WR South LLC (collectively "Defendants" or "AMCC"), allege and say:

# I.    NATURE OF THE ACTION.

1.    The Defendants, consisting of Lend Lease and Winn entities, own and manage over 4,000[1] housing units at Marine Corps Base Camp Lejeune ("MCB Camp Lejeune") under the terms of a 50-year ground lease with the United States Department of the Navy ("Navy"). Active management and control over the housing lies with the Defendants; they do not enjoy immunity.[2] The government placed its trust in these private companies, who promised both the Navy and the military families that they would provide excellent quality housing. Indeed, this is necessary so that servicemembers can maintain morale and focus on protecting the nation.

2.    However, after being given sole responsibility, Lend Lease and Winn placed profits over tenants. This led to cockroaches, filth, vermin, leaks, water intrusion, mold and mildew, failing appliances and fixtures, ineffective maintenance, inadequate repairs, and rude and bullying customer service. Meanwhile, the military housing property management became a profit center for Defendants, as they took the full Basic Allowance for Housing ("BAH")[3] for each servicemember tenant each month.

3.    As conditions grew worse, Defendants exploited the fact that military servicemembers are trained not to complain. When families did complain, they feared that Defendants would use their superior power to cause retaliation. Making matters worse, the Defendants shielded exposure of the scope of their delinquency by use of misleading surveys and service data. Defendant's failure to provide quality property management and repair and

---

[1] See general information at https://www.lejeune.marines.mil/New-Personnel/Settling-In/. This lawsuit excludes tenants at Heroes Manor, which is managed by another provider.
[2] *Childs v. San Diego Family Housing, LLC*, No. 3:19-cv-02329-JM-MDD (S.D. Cal.), see United States Statement of Interest, Doc. 32, filed Aug. 17, 2020.
[3] Federal law provides that any "member of a uniformed service who is entitled to basic pay" is also "entitled to a basic allowance for housing." 37 U.S.C. § 403(a)(1). The amount of such BAH will vary according to the service member's pay grade, dependency status and geographic location. *Id.*

2

maintenance service led to unacceptable and intolerable residential housing conditions for the named Plaintiffs and for other similarly situated servicemember families.

4.　　Over time, Plaintiffs and other servicemember families began to connect with each other and work with elected representatives and nonprofit groups to expose the unacceptable conditions. As the problems at MCB Camp Lejeune and other privatized military housing projects were revealed, this led to public outcry, congressional hearings and governmental watchdog investigations, within the last two years. The Governmental Accountability Office ("GAO") determined that the satisfaction surveys and maintenance data kept and promoted by the top five privatized providers, including Defendants, were unreliable. The CEO of Lend Lease was summoned to testify in Congress and admitted to "unacceptable"[4] conditions. Lend Lease has promised to make upgrades prospectively but has not offered any compensation retroactively for the affected military families. The purpose of this lawsuit is to obtain such relief, and to ensure full abatement of the nuisance.

5.　　Plaintiffs and class members share common issues, which stem from common facts prevalent across the putative class, and include the following:

    a.　　During the class period embracing the last four years, servicemembers executed substantially identical Form Leases[5] with Defendants Atlantic Marine Corps Communities LLC and AMCC Property Management LLC;

    b.　　The families have lived in similar units built using economies of scale;

    c.　　The families have all relied on the same AMCC property management;

    d.　　Servicemembers pay similar BAH amounts;

---

[4] Denis Hickey, Chief Executive Officer, Lendlease Americas Inc., Dec. 5, 2019 Statement, House Armed Services Committee Hearing, "Privatized Housing: Are Conditions Improving for Our Military Families?" available at https://www.congress.gov/116/meeting/house/110267/witnesses/HHRG-116-AS03-Wstate-HickeyD-20191205.pdf

[5] Generic version available online at https://www.lejeune.marines.mil/portals/27/documents/family-housing/public-private-venture/amcc-nc-lease-agreement.pdf ("Form Lease").

3

e.	Each servicemember's BAH amount was calculated based on the cost of reasonable rental housing and based on the promise made by Defendants to the families and to the military to provide quality healthy housing;

f.	But servicemembers did not get a reasonable rental housing product worth the BAH, due to Defendants' violations of their obligations both stated in their agreements with the Navy, and imposed on them by the common law governing their landlord-tenant relation with the tenants;

g.	Servicemembers depend on the landlord to repair and maintain the premises, appliances, their Heating, Ventilation, and Air Conditioning ("HVAC") systems, and other fixtures;

h.	Part of military family quality of life, i.e., their housing experience, consists of being able to rely on safe and effective service, repair, maintenance and upkeep of the premises; this is a protected property interest under the law of habitability and temporary recurrent private nuisance;

i.	But that is not the leased housing product they got.  A recent survey of MCB Camp Lejeune servicemember families found that 65% had issues with repair, maintenance and remediation; 60% had negative or very negative experiences; 38% had issues with mold; 33% had issues with weather damage; 23% had structural concerns; and 20% reported filth in the units;[6]

j.	Meanwhile, the Lend Lease / Winn AMCC entities promoted deceptive resident satisfaction surveys that misrepresented the actual situation. The GAO recently found them to be unreliable.[7]

k.	And, AMCC kept customer service, repair, maintenance and remediation records that were also false and misleading.  When the GAO investigated, they found the data unreliable as well.[8]

---

[6] Military Family Advisory Network ("MFAN"), Final Research Report:  Living Conditions of Families in Privatized Military Housing, May 2019 ("MFAN 2019"), at pp. 10 (survey took place in early 2019), 15 (21.07% had very negative satisfaction rate, 39.46% had negative for total of 60.53%), 156 (showing Lejeune survey results by issues and manifest effects:  Maintenance, repairs, or remediation, 65%; Mold, 38%; Weather damage, 33%; Structural concerns, 23%; Filth in homes, 20%).
[7] GAO, Military Housing: Preliminary Recommendations to Strengthen DOD's Oversight and Monitoring of Privatized Housing, GAO-20-471T, March 3, 2020, p. 11 ("Unreliable" and "misleading").
[8] GAO, Military Housing Privatization: Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, GAO-20-280T, Dec. 3, 2019, p. 11 (noting "these data are not captured reliably or consistently for use in the ongoing monitoring of the condition of privatized housing units"); GAO Watchdog Report, March 2020 (Elizabeth Field, Defense Capabilities and Management Director, describing "work order data" as "unreliable").

6.      The named Plaintiff class representatives exemplify the negative effects that this unfair and deceptive residential leasing business model has caused, and that the Defendants' failure to abide by their promises to tenants and to the government has caused. While the effects may differ by family, the causes are common.  The case is appropriate for class certification either in full under Fed. R. Civ. P. 23(a) & (b) with regard to all claims for relief for the defined class, or, in full for certain claims, in part for relevant issues under one or more claims under Rule 23(c)(4), and with provision for one or more subclasses under Rule 23(c)(5).

## II.      THE PARTIES.

### A.  Plaintiffs.

7.      First Sergeant **Scott A. Johnson** (1st Sgt; E-8) has been a servicemember with the United States Marine Corps ("Marines") for over 18 years.  From October 2015 through mid-2019, 1st Sgt Johnson, his wife Lindsey, and their three minor children resided in a rental duplex home at 7061 Omaha Road, Jacksonville, NC 28543, in the AMCC Knox Landing development.

8.      On October 23, 2015, 1st Sgt Johnson executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property.  During the pertinent times, 1st Sgt Johnson was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

9.      Plaintiff **Lindsey Johnson** is the wife of 1st Sgt Johnson.  During the pertinent times, Ms. Johnson held a possessory and occupancy interest in the property.

10.     Staff Sergeant **Garrett Burn** (SSgt; E-6) has been a servicemember with the Marines for over 12 years.  Starting in August 2018, SSgt Burn, his wife Kalie, and their children resided in a rental home at 6855 Omaha Road, Jacksonville, NC 28543, in Knox Landing.

5

11.     On August 7, 2018, SSgt Burn executed a Form Lease with AMCC regarding the property.  During the pertinent times, SSgt Burn was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest.

12.     Plaintiff **Kalie Burn** is the wife of SSgt Burn.  During the pertinent times, Ms. Burn held a possessory and occupancy interest in the property.

13.     Corporal **William Lewis** (Cpl; E4) is a servicemember with the Marines. Beginning in October 2019, Cpl Lewis, his wife Lakin and, once born, their infant child resided in a rental unit in a four-unit building located at 1237 Monarch Court, Jacksonville, NC 28543, in the AMCC Tarawa Terrace community.

14.     On October 9, 2019, Cpl Lewis executed a Form Lase with AMCC.  During the pertinent times, Cpl Lewis was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest.

15.     Plaintiff **Lakin Lewis** is the wife of Cpl Lewis.  During the pertinent times, Ms. Lewis held a possessory and occupancy interest in the property.

## B. Defendants.

16.     The Defendants consist of entities associated with the Lend Lease construction and property development multinational based in Australia, and the Winn property management company headquartered in Boston.  As shown below, the Lend Lease and Winn organizations formed a joint venture to build, own and manage the privatized military housing at MCB Camp Lejeune.  To do so, they set up a convoluted corporate structure as alleged further below.

17.     Defendant **Lend Lease (US) Public Partnerships LLC** is a Delaware limited liability company doing business in North Carolina.  The members of Lend Lease (US) Public Partnerships, LLC are Lend Lease (US) PPP, Inc. and Actus ATD Inc., both Delaware corporations

with a principal place of business in New York. On information and belief, Lend Lease (US) Public

Partnerships LLC has during the class period performed housing-related construction, renovation

or demolition work at MCB Camp Lejeune.[9]  It may be served with process at its office address at

5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800,

Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; or 200 Park Avenue,

9th Floor, New York, NY 10166.

18.     Defendant **Lend Lease (US) Public Partnerships Holdings LLC** is a Delaware

limited liability company doing business in North Carolina.  Lend Lease (US) Public Partnerships

Holdings LLC is the sole member of AMCC Managing Member LLC.[10]  The members of Lend

Lease (US) Public Partnerships Holdings LLC are Lend Lease (US) Public Partnerships, LLC and

Lend Lease (US) PPP, Inc.  This entity may be served with process at its office address at 5401

Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800,

Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; or 200 Park Avenue,

9th Floor, New York, NY 10166.

19.     Defendant **AMCC Managing Member LLC** is a Delaware limited liability

company doing business in North Carolina stated to have a main office in Tennessee.[11]  It and the

Navy are the members of Atlantic Marine Corps Communities, LLC.  The sole member of AMCC

Managing Member LLC is Lend Lease (US) Public Partnerships Holdings, LLC.[12] AMCC

Managing Member LLC is an indirect subsidiary of the Australian multinational, Lend Lease. This

---

[9] *Cf. James v. Guardian Fall Protection, Inc.,* No. 5:16-cv-00035-D, E.D.N.C., Doc. 29, answer filed Feb. 26, 2016, ¶¶ 6, 16 (describing that Atlantic Marine Corps Communities LLC as owner entered into a contract with Lend Lease (US) Public Partnerships LLC, f/k/a Actus Lend Lease LLC, to serve as the design builder for a re-roofing project for military housing located at New River Air Station, Onslow County), 17-19 (identifying employees with Lend Lease (US) Public Partnerships Holdings LLC including project director, project engineer, construction manager).
[10] *See James,* No. 5:16-cv-00035-D, E.D.N.C., answer filed Feb. 26, 2016, Doc. 29, ¶ 9; notice of removal filed Jan. 20, 2016, Doc. 1, p. 4.
[11] *Gillespie v. Actus Lend Lease LLC,* No. 9:10-cv-00120-RMG (D.S.C.), answer, March 2, 2010, ¶ 9 (so stating).
[12] *James*, No. 5:16-cv-00035-D, E.D.N.C., notice of removal, Doc. 1, p. 4.

7

entity may be served with process at its office address at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800, Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; 200 Park Avenue, 9th Floor, New York, NY 10166; or, c/o CT Corporation System, 160 Mine Lake Court Suite 200, Raleigh NC 27615-6417.

20.     Defendant **Atlantic Marine Corps Communities LLC** is a limited liability company organized under Delaware law and doing business in North Carolina stated to have a main office in Tennessee.[13]  It may be served with process at its office address at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800, Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; 200 Park Avenue, 9th Floor, New York, NY 10166; or, c/o CT Corporation System, 160 Mine Lake Court Suite 200, Raleigh NC 27615-6417.

21.     Atlantic Marine Corps Communities LLC is listed as the "Owner" on the Form Lease.[14]  It was formed on May 16, 2005 in connection with the Lend Lease organization winning the bid to provide the privatized military housing including at MCB Camp Lejeune.  The Lend Lease organization via its indirect subsidiary AMCC Managing Member LLC has represented that it owns a two-thirds interest of Atlantic Marine Corps Communities LLC and is its active managing

---

[13] *Gillespie,* No. 9:10-cv-00120-RMG (D.S.C.), answer filed March 2, 2010, ¶ 10 (so stating).
[14] Form Lease, p. 2.

8

member;[15] with the Navy a passive minority member with a one-third interest.[16]  No claim herein is brought against the Navy.

22.     Plaintiffs separately name as Defendants AMCC Property Management LLC and Atlantic Marine Corps Communities Property Management LLC due to ambiguity in available information regarding what may be one legal entity working under assumed names.   On information and belief, **AMCC Property Management LLC** is a limited liability company formed under Delaware law and doing business in North Carolina, and said to have a main office in Tennessee.[17]  According to Onslow County Register of Deeds filings,[18] Winn LLC Manager, Inc. is the manager of Winn Military Housing Ventures LLC, which is the manager of Winn Housing Services LLC, which is the sole member of AMCC Property Management LLC.  It may be served with process at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; One Washington Mall, Suite 500, Boston MA 02108; 200 Park Avenue, 9th Floor, New York, NY 10166; or c/o Cogency Global Inc., 850 New Burton Road Suite 201, Dover, Delaware 19904.

23.     On information and belief, **Atlantic Marine Corps Communities Property Management LLC** is a limited liability company formed under Delaware law and doing business

---

[15] *Atlantic Marine Corps Communities, LLC v. Onslow County*, No. 7:06-cv-00035-H, 497 F. Supp. 2d 743, 748 & n.4 (E.D.N.C. 2007) ("As discussed at the hearing held in this matter, Actus [the former name for the Lend Lease United States entity later name-changed in 2011 to Lend Lease (US) Public Partnerships LLC] retains a 2/3 interest in AMCC; the Department of the Navy retains a 1/3 interest in AMCC. Actus is a member and the 'Managing Member' of AMCC; the government is a member.").  This arrangement is not unusual.  *E.g., AETC II Privatized Housing, LLC v. Tom Green Cnty. Appraisal Dist.*, 2015 Tex. App. LEXIS 6357, *1-2 (Tex. 3rd Court of Appeals June 24, 2015) (Goodfellow Air Force Base; privatized military housing; "AETC is a public-private venture, formed as a Delaware limited liability company, in which the U.S. owns 49% as an investor member.").
[16] 497 F. Supp. 2d 743, 748.  Among other things, "[t]he government 'shall not take part in the management of [AMCC], transact any business for or in the name of [AMCC], or have the right or power to sign documents for or otherwise bind [AMCC].'"  *Id.,* quoting from the Limited Liability Company Operating Agreement of AMCC.
[17] *Gillespie,* No. 9:10-cv-00120-RMG (D.S.C.), answer filed March 2, 2010, Doc. 21, ¶ 13 ("AMCC Property Management LLC, admits that it was a corporation [sic] duly organized and incorporated in the State of Delaware with its principal place of business in Tennessee").
[18] Onslow County Register of Deeds, Book 3247, Page 821, June 19, 2009.

in North Carolina.[19]  It may be served with process at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; One Washington Mall, Suite 500, Boston MA 02108; 200 Park Avenue, 9th Floor, New York, NY 10166.

24.     AMCC Property Management LLC is identified in the Form Lease as being the "Authorized Agent"[20] of Atlantic Marine Corps Communities LLC (the "Owner"), and as being "authorized to manage the Premises on behalf of Owner."[21]  Atlantic Marine Corps Communities Property Management LLC has represented itself previously in materials filed in this Court as being a "division" of Winn Management Group LLC, which manages rental homes for military personnel at MCB Camp Lejeune.[22]  On June 19, 2009, AMCC Property Management LLC filed a certificate of assumed name with the Onslow County Register of Deeds to use the assumed name of "Atlantic Marine Corp Community" [sic] and identified its sole member as being Winn Housing Services LLC.[23]

25.     Defendant **Winn Management Group LLC** is a limited liability company organized under Massachusetts law and doing business in North Carolina.  It may be served with process at its office at One Washington Mall, Suite 500, Boston MA 02108; 2400 Burton St #400, Richmond, VA 23223; 6 Faneuil Hall Marketplace, Boston MA 02109; or c/o Cogency Global Inc., 212 South Tryon Street, Charlotte NC 28281.

---

[19] *Hess v. Atlantic Marine Corps Communities Property Management, LLC*, No. 7:13-cv-00018-BO (E.D.N.C.), Amended complaint, Doc. 11, ¶ 2, Answer, Doc. 12, ¶ 2 (operating in Onslow County).
[20] Form Lease, p. 1.
[21] Form Lease, p. 2.
[22] *Hess*, Declaration of B.J. Cozart, Doc. 30-2, filed Jan. 17, 2014, ¶¶ 1-2 (averring regarding "Winn Management Group, LLC ('Winn') and Atlantic Marine Corps Communities Property Management, LLC ('AMCC')" that "AMCC, which is a division of Winn, manages rental homes for military personnel in various states and is associated with eight military installations, including Camp Lejeune, North Carolina."); supplemental declaration of B.J. Cozart, Doc. 33-6 (same); and cf. mem. in support of def. motion for summary judgment, Doc. 30, p. 2.
[23] Onslow County Register of Deeds, Book 3247, Page 821.

26.     Defendant **WR South, LLC** is a Delaware limited liability company that on information and belief has assisted Winn with regard to MCB Camp Lejeune.  It was originally formed under the name Winn Management South LLC on or about December 17, 2008.  On February 27, 2009, it filed a certificate of assumed name with the Onslow County Register of Deeds to use the assumed name WinnResidential.[24]  On June 28, 2010, it changed its name to WR South, LLC.  On March 15, 2019, WR South LLC filed an annual report with the North Carolina Secretary of State stating that it engaged in "real estate management," and could be served at c/o Cogency Global Inc., 212 South Tryon Street, Charlotte NC 28281, or at its home office address, 6 Faneuil Hall Marketplace, Boston MA 02109.

27.     Atlantic Marine Corps Communities Property Management LLC and Winn Management Group LLC have represented in prior filings in this Court that service, repair and maintenance workers at MCB Camp Lejeune have been employed by Atlantic Marine Corps Communities Property Management LLC and Winn Management Group LLC.[25]

28.     Winn has represented in press releases that the property management at MCB Camp Lejeune is provided by "WinnResidential Military Housing Services," also known as "WinnMilitary,"[26] which is a "joint-venture" of the Winn and Lend Lease organizations.[27]  Lend

---

[24] Onslow County Register of Deeds, Book 3189, Page 92.

[25] *Hess*, No. 7:13-cv-00018-BO, E.D.N.C., Doc. 7, p. 1 (stating that the plaintiff former repair and maintenance employee at MCB Camp Lejeune "was employed by Atlantic Marine Corps Communities Property Management LLC and Winn Management Group LLC"); Doc. 30, p. 1 (the plaintiff was "a former employee of AMCC [defined as Atlantic Marine Corps Communities Property Management LLC], which is a division of Winn [defined as Winn Management Group, LLC]"); Doc. 30-5, Declaration of Cathy Murray ¶ 4 (plaintiff had been employed "with Atlantic Marine Corps Communities Property Management LLC").

[26] Winn website, press release, WinnMilitary President Patrick Appleby Appointed President of WinnResidential, Jan. 30, 2017 (describing that "WinnResidential Military Housing Services" is "also known as WinnMilitary" and that "WinnMilitary manages [homes] for members of the U.S. Armed Forces and their families through a joint venture between WinnCompanies and Lendlease").

[27] Winn website, https://www.winncompanies.com/winnmilitary/ ("Formed under the Military Housing Privatization Initiative (MHPI), WinnResidential Military Housing Services is a joint-venture of WinnCompanies and Lendlease…. The WinnMilitary management portfolio includes … Atlantic Marine Corps Communities" including "Jacksonville, North Carolina: MCB Camp Lejeune & MCAS New River") (last accessed 9/16/20).

11

Lease investor presentations have represented that military base property management was performed by "Lend Lease Residential / Winn."[28]

29.     On information and belief, under the facts and circumstances, each of the Defendants has acted as a joint tortfeasor, agent of the others, joint venture participant, or has otherwise engaged in, and aided and abetted one another in, the joint enterprise of leasing military housing at MCB Camp Lejeune, as well as the other conduct and acts alleged herein.  On information and belief, during the pertinent times, each of the Defendants was sufficiently directly and materially involved in the relevant facts, acts and omissions, so as to incur joint and several liability in this matter due to its direct material involvement.  In addition, or in the alternative, on information and belief, and to the extent that the evidence shows and equity may require, during the relevant times, there existed a unity of interest and ownership among Defendants, their predecessors, agents, and parents, such that any individuality and corporate separateness among them has ceased, and each such entity may fairly be deemed the alter ego of each other entity.

## III.     JURISDICTION AND VENUE.

30.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d)(2)(A), as it is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.

31.     This Court has personal jurisdiction over Defendants because of their business contacts with the State of North Carolina and their management of privatized military housing at MCB Camp Lejeune in Jacksonville, North Carolina.

---

[28] Lend Lease Investor Tour, slide presentation, July 16, 2004, available at http://media.corporate-ir.net/media_files/IROL/18/186950/actuslendlease_FINALv3.pdf (last accessed 9/16/20) ("2004 slides"), slide 43.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS.

### A.     Background regarding the MHPI, Defendants, and MCB Camp Lejeune.

#### 1.     The MHPI and the BAH.

33.     Defendants and their related entities consist of one of the largest construction multinationals in the world (Lend Lease) and one of the largest property management companies in the United States (Winn).  The families consist of servicemembers whose income is limited, as is their market power. The Defendants have had since 2005 or earlier to cultivate relationships at MCB Camp Lejeune.  Servicemember tenants are stationed there temporarily.

34.     In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI") in response to Department of Defense ("DoD") concerns about the effect of poor-quality housing on servicemember families.[29]  Being a landlord is not a core competency of the military.[30]  Under the MHPI, responsibility was transferred to private-sector developers for construction, renovation, maintenance, and repair of housing.[31]

35.     Since 1996, private-sector developers and property management companies have assumed primary responsibility for the construction, renovation, maintenance, and repair of about 99 percent of domestic military family housing in the United States.[32]

---

[29] National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, §§ 2801-02 (1996), codified as amended at 10 U.S.C. §§ 2871-85.  *See generally* Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019, No. GAO-20-280T, p. 1; *Atlantic Marine Corps Communities, LLC v. Onslow County,* 497 F. Supp. 2d 743, 747-48 (E.D.N.C. 2007) (providing background on MHPI, AMCC and housing at Camp Lejeune); *Bessinger v. United States,* 448 F. Supp. 2d 684, 686 (D.S.C. 2006) (background on AMCC).
[30] 2004 slides, at slide 17 ("Non-core competency").  See also slide 18.
[31] https://www.gao.gov/assets/710/705509.txt (accessed 8/20/20).
[32] No. GAO-20-280T, p. 1.

13

36.     Under the MHPI, the private company enters into a 50-year ground lease with the applicable department of the military.  These ground leases share generic similarities.  Under the ground lease terms, the relevant branch of the military is not involved in the day-to-day operations pertaining to the construction or management of the housing units.[33]

37.     Public versions of some of the ground leases and related operating agreements for other bases reflect that the private entities (here Lend Lease and Winn), are deemed the managing member; they promise to develop, construct, maintain, operate and manage the project to a high level of skill and care for the duration; they have exclusive management and control including all the rights and powers of a manager to do all things which are necessary, proper or desirable to carry out their duties and responsibilities;  and further, they carry insurance and indemnify or hold harmless the military department (such as the Navy) for any claims arising out of the department's participation as a non-managing member.[34]

38.     With regard to MCB Camp Lejeune, similarly, publicly disclosed information regarding the operating agreement (which Defendants claim to be confidential) reflects that Atlantic Marine Corps Communities, LLC was organized, among other things, to "own, lease, manage, acquire, operate and maintain Improvements and the Land" and that "[t]he government 'shall not take part in the management of [AMCC], transact any business for or in the name of [AMCC], or have the right or power to sign documents for or otherwise bind [AMCC].'"[35]

---

[33] *See Bessinger*, 448 F. Supp. 2d at 691 (50-year lease for United States Marines Corps Air Station, Beaufort SC, noting "the Lease makes it clear that the United States was not involved in the day-to-day operations of the construction or management of the housing units").

[34] *Childs v. San Diego Family Housing, LLC*, No. 3:19-cv-02329-JM-MDD (S.D. Cal.), United States Statement of Interest, Doc. 32, filed Aug. 17, 2020, p. 4 (summarizing operating agreement); Doc. 32-1 (example of an operating agreement), Doc. 32-2 (example of a ground lease).

[35] *Atlantic Marine Corps Communities, LLC v. Onslow County*, No. 7:06-cv-00035-H, 497 F. Supp. 2d 743, 748 (E.D.N.C. 2007).

14

39.     Lend Lease is a multinational construction, property and infrastructure company headquartered in Sydney, Australia.  It is publicly traded on the Australian stock exchange.  As of 2019, per its annual report for that year, it had a development pipeline approaching $100 billion,[36] its total group revenue was $16.5 billion,[37] and its core profit after tax in 2019 was $804 million.[38]

40.     After a bidding process, the Navy in 2005 selected Lend Lease to renovate, demolish, and construct military housing units at MCB Camp Lejeune, Marine Corps Air Station New River, and Marine Corps Air Station Cherry Point.[39]  An operating agreement and 50-year ground lease were executed on October 1, 2005.[40]  Under those documents and agreements, the Lend Lease and Winn entities collectively named as AMCC herein hold the day-to-day operational decision-making authority.

41.     According to Lend Lease, in 2005, the Navy/Marines selected it to privatize Phase I housing at MCB Camp Lejeune,[41] and in 2006, Phase II housing.[42]  Phase 1 became operational in October 2005 with 3,300 units.  Phase 2 became operational in November 2006 with 1,050 units.  Later phases became operational in November 2007 and March 2013.  One of the last developments built was the Knox Landing community where the Johnson and Burn family homes are located.  The number of residential units totals in the thousands.[43]  As of today, the relevant communities include the following:[44]

---

[36] 2019 annual report, p. 10.
[37] 2019 annual report, p. 64.
[38] Lend Lease 2019 annual report, p. 8.
[39] *See Atlantic Marine Corps Communities, LLC v. Onslow County,* 497 F. Supp. 2d 743, 747-49 (E.D.N.C. 2007).
[40] *Atlantic Marine Corps Communities, LLC,* 497 F. Supp. 2d at 749 ("The Operating Agreement and Ground Lease were executed on October 1, 2005.").  See also Memorandum of Real Estate Ground Lease and Conveyance of Facilities, dated Oct. 1, 2005, between Department of the Navy and AMCC Managing Member LLC, recorded at Onslow County Register of Deeds, Book 2531, Page 50.
[41] 2006 slides, slide 1.
[42] 2006 slides, slide 1.
[43] Lend Lease 2013 annual report, p. 60.
[44] https://www.lejeune.marines.mil/Offices-Staff/Family-Housing-Division/Housing-Areas/ (accessed 8/20/20).

| Rank | Community | Floor plans |
|------|-----------|-------------|
| E1 - E5 | Tarawa Terrace | Timmerman, Adriance |
| | Midway Park | Bauer, Mayfield |
| | Berkeley Manor | Kearby, Maxwell |
| | MCAS, New River | McGinnis |
| | | |
| E6 - E9 | Berkeley Manor | Kearby, Maxwell |
| | Watkins Grove | Barnett, Basilone |
| | Knox Landing | Garcia, Keith |
| | MCAS, New River | McGinnis |
| | | |
| WO1-O3, O1-O3 | Paradise Point | Dewey, Epperson, Phillips, Tomlin, Cottage |
| | MCAS, New River | Anderson, Kellogg |
| | | |
| WO4-O5, O4-O6 | Paradise Point | Dewey, Epperson, Watson |
| | MCAS, New River | Kelly, Singleton |

42.     Defendants collect rents equivalent to the BAH.[45]  The amount is set to reflect a rental amount that would obtain reasonable quality housing in the region.  The BAH amount varies according to rank.  However, during the class period within the last four years, Plaintiffs and other servicemember families have not received such housing as was promised by Defendants in return for the BAH.  The rental housing offered by Defendants has been plagued by problems consistent with "slumlord" property management, including water intrusion, mold, mildew, filth, insect pests, broken and unreliable HVAC and appliances, and other issues.[46]

## 2.  **Form Leases with servicemembers at MCB Camp Lejeune.**

43.     During the pertinent times, tenants signed a generic Form Lease with take-it-or-leave-it terms.  The Form Leases of the Plaintiff servicemembers are substantially similar.  The

---

[45] 2004 slides, slide 29.
[46] AMCC also manages military housing at Tri-Command (Beaufort SC); Westover (Chicopee MA); Cherry Point (Havelock NC); and Fort Drum/Stewart Air National Guard (New Windsor NY).  See AMCC website at https://www.atlanticmcc.com/ (last accessed 9/16/20).  In addition to privatized housing it manages via AMCC, Lend Lease also operates privatized military housing at other bases including: Alaska -- Fort Greely, Fort Wainwright; Arizona -- Davis-Monthan AFB; California -- Los Angeles AFB; Colorado -- Peterson AFB, Schriever AFB; Hawaii -- Fort Shafter, Helemano and Tripler AMC, Joint Base Pearl Harbor-Hickam, Schofield Barracks, Wheeler AAF; Kentucky -- Fort Campbell; Louisiana -- Fort Knox; New Mexico -- Holloman AFB; and Texas -- Fort Hood.  See Understanding Privatized Military Housing, at www.militarybyowner.com (last accessed 9/16/20).

terms of the form lease and incorporated materials reflect that Defendants were obligated to provide quality housing and property management. The servicemember families were effectively captive to the lease over its duration.

44.     The Form Lease represents that Defendants are "responsible for maintenance and repair of the Premises, and for ensuring that the Premises are safe and habitable."[47]

45.     The Form Lease incorporates by reference a document entitled "Atlantic Marine Corps Communities, LLC, Community Guidelines & Policies."[48]

46.     In the Guidelines & Policies, Defendants represent that they will "improve quality of life for service members and their families," and that they "assume responsibility for the military family Resident's housing at MCB Camp Lejeune." Defendants violated these promises by failing to improve quality of life and failing to properly assume housing responsibility.

47.     The Guidelines & Policies further represent that "AMCC Property Management, as the agent for AMCC LLC will perform the day-to-day property management responsibilities" and that their "Property Management staff and the associated on-site maintenance staff stand ready to assist Residents in every possible way to ensure superior quality housing services and amenities."[49] During the class period, as a result of Defendants' property management practices which violated their agreements with the Navy and their landlord-tenant duties, these representations were rendered false and misleading. This contractual promise was breached for Plaintiffs and class members. Defendants were aware that these representations were false and misleading; Plaintiffs and class members did not prior to moving in.

---

[47] Form Lease ¶ 12.
[48] Form Lease, page 4 of 9, sections 11, 13, 38 ("Resident acknowledges receipt of the following Addenda, copies of which are attached hereto and are incorporated as part of this Lease …. Community Guidelines and Policies.").
[49] Community Guidelines & Policies, p. 4.

17

48.     Under the Form Lease, the servicemember tenant "agrees to pay monthly Rent equal to the Basic Allowance for Military Housing at the 'with dependent' rate (the 'BAH') at the Resident's duty station of the pay grade of the Resident service member."[50]  There is no ability for a servicemember to negotiate the price of this housing; the servicemember is required to pay the rent in full.  A servicemember must forfeit the entire BAH upon acceptance of housing.

49.     The BAH program provides an in-kind, tax-free benefit to service members in recognition of the fact that the average military assignment of three years makes purchasing a home untenable.  By obtaining automatic assignment of the BAH through the provisions of the form lease, Defendants treat the BAH as a guaranteed revenue stream.

50.     Under the BAH arrangement and terms of the Form Lease, the tenant does not have the ability to threaten to withhold some or all of his rental payment from the landlord as a means of forcing the landlord to remedy poor conditions.

51.     The Form Lease prohibits residents from taking many self-help measures.  For example, except for an emergency, the lease prohibits residents from making "repairs, alterations or improvements"[51] and prohibits them from deducting the costs of these repairs from the rent.

52.     Defendants were aware when agreeing to perform privatized military housing construction, repair and maintenance services that the base was located in a warm, wet, southern climate and environment, in low-lying lands near the ocean and its inlets, and subject to periodic hurricanes and weather events. The climate and environmental conditions of MCB Camp Lejeune are conducive to water intrusion and the growth of mold.  During the class period, Defendants breached their contractual and landlord-tenant duties to provide safe housing and responsible property management for Plaintiffs and class members pertaining to mold.

---

[50] Form Lease ¶ 3(A), p. 2.
[51] Form Lease ¶ 12.

53.     In light of the significant issues with mold, Defendants inserted a "Mold Addendum" in their lease documents. While much of it is self-serving, the document nonetheless requires as to mold problems, that "Management will respond in accordance with the state law and the Lease to repair or remedy if necessary."[52]

54.     Servicemembers and their families reasonably expect housing that is safe, habitable and properly maintained. Defendants are required to provide such housing. Military families need and deserve safe and healthy homes at their assigned installations to sustain military and family readiness, recruitment and retention.

55.     Defendants are required to operate the housing at MCB Camp Lejeune in good order and in a clean, safe condition at their expense, in accordance with their marketing representations that they offer first-class residential rental housing for tenants.

56.     Many military families are young families with infants or young children. The servicemember parent is often deployed, far away from home for an extended period, or busy with demanding assignments on-base. Due to these circumstances, it is important that servicemember families receive safe housing and effective service.

57.     During the last four years, Defendants' conduct has substantially and unreasonably interfered with Plaintiffs and class members' ability to use and enjoy their homes and has materially affected their health, safety and well-being in their homes, and has resulted in unacceptable, unsanitary, unsafe, unhealthy and intolerable conditions at the military housing owned and operated by Defendants at MCB Camp Lejeune and elsewhere.

58.     The specific facts of the named Plaintiffs, described further below, reflect these unacceptable and intolerable conditions.

---

[52] Mold and Mildew Addendum, page 2 of 3.

### 3. **Defendants' profit maximization and property mismanagement.**

59.    The unacceptable conditions at issue herein occurred due to Defendants failing to adequately fund their property construction, upkeep, repair, maintenance, remediation and property management at MCB Camp Lejeune.  This failure resulted in the quality of the rental housing product deteriorating to unacceptable levels—so that Defendants could maximize their profits at the expense of the military families in their charge.  Defendants operated the military housing at MCB Camp Lejeune as a profit center, without regard to the habitability of the housing they had contractually agreed to provide to the military families.

60.    Defendants cut repair and maintenance costs for MCB Camp Lejeune not only to push up profits, but also to ensure it met commitments to its lenders and investors under financial terms (including changing interest rate and BAH metrics) that were unfavorable to Lend Lease.

#### a. *Operation of the military housing as a profit center.*

61.    In 2004-05 in connection with securing financing, Defendants promised outsize gains to their private investors which incentivized Defendants to reduce maintenance costs for the housing to unconscionable levels.  During the class period, Defendants were aware that they were underfunding service and maintenance because they could compare their budgets for Lejeune to those with regard to other, non-military housing projects where Defendants had a greater need to meet tenant expectations because they could not exploit them as captives to the leases as they were able to do with the military families.

62.    In "investor roadshow" presentations, Lend Lease projected that out of a hypothetical BAH rental payment of $814, there would be aggressive returns for investors after paying for the costs for maintenance, repairs, and service.  Lend Lease represented that the monthly cost to maintain the property ($131) would be less than the profit back to investors ($148), even

20

after debt repayment ($175).[53]  Likewise in a 2006 presentation,[54] Lend Lease represented to investors that after all expenses and debt servicing were paid, there would still be an enticing 10% to 25% return on investment.

63.     When Lend Lease bid for MCB Camp Lejeune in the 2005-06 window, interest rates were at their height.  Lend Lease made commitments for debt servicing on the loans it took out to finance the project, based on those rates.  In its 2004 investor presentation, Lend Lease represented that for another project, Fort Hood, it had long-term loans in place that it was obligated to repay at 6.42% to 7.06% interest.[55]  On information and belief, it incurred similar loan terms for MCB Camp Lejeune.  Since 2005-06, rates have gone down, exerting further pressure to cut costs.

64.     Despite challenging economic conditions, during the class period, Lend Lease turned privatized military housing into a profit center, nearly doubling its project valuation.[56]  This was done by cutting service, repair and maintenance costs, letting housing deteriorate, and causing military families to live in abhorrent conditions.

65.     In its 2018 annual report, Lend Lease described that "[k]ey highlights included the performance of our investments in … the US Military Housing portfolio"[57] and touted "a substantial uplift in the value of the equity investment in the US Military Housing operations."[58] "Higher fund management fees were generated" and "[a]sset and property management fees from our US Military Housing operations … continue to support recurring earnings."[59] Likewise, its

---

[53] In the aftermath of the revelation that military housing conditions had grown abhorrent, the privatized housing companies pointed to the changes in interest rates as a reason why their profit margins have gone down.
[54] 2006 slides, slide 9.
[55] 2004 slides, slide 86.
[56]  2018 annual report, p. 170; 2019 annual report, p. 160; Michael West, Abracadabra: Lendlease magic tricks come home to roost, March 15, 2019, available at https://www.michaelwest.com.au/abracadabra-lendlease-magic-tricks-come-home-to-roost/.
[57] 2018 annual report, p. 72.
[58] 2018 annual report, p. 80.
[59] 2018 annual report, p. 80.

2019 annual report stated that "[a]sset and property management fees from the US Military Housing portfolio … continue to support recurring earnings."[60]

66.     Defendants' allowing of housing conditions at MCB Camp Lejeune to deteriorate to a slumlord level is egregious when viewed in light of the profits Lend Lease was touting from its property management during the class period. Defendants' revenues and profits are relevant in determining the unreasonableness of their conduct in creating, and refusing to timely abate, a temporary recurrent private nuisance.

67.     During the class period, as a result of Lend Lease and Winn's uniform property management policies, practices and funding, Defendants breached their promise to be responsible for maintenance and repair of the premises and to ensure that the premises were safe and habitable for Plaintiffs and class members.

68.     Defendants, by virtue of their course of administering, leasing, building, and repairing the houses at MCB Camp Lejeune, were uniquely aware of the substandard conditions of the houses, including the existence of mold, electrical, plumbing, insect, water intrusion, and HVAC issues associated with the houses. Nevertheless, Defendants knowingly and intentionally leased houses to Plaintiffs, misrepresenting that they were habitable, and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

### b. *False and misleading tenant surveys.*

69.     For years, Defendants promoted slanted customer surveys to paint a misleading picture of tenant satisfaction. During the pertinent times, Defendants promoted resident satisfaction rates that do not accord with reality, as noted by the GAO in its 2019 report.[61]

---

[60] 2019 annual report, p. 70.
[61] Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019 (GAO 12/3/19), available at https://www.gao.gov/assets/710/702950.pdf. See also Richard Sisk, Military dot com, Surveys Showing High

70.     When surveyed by a nonprofit in 2019 in a study cited by Congress, tenants described a four-to-one ratio of negative to positive experiences at MCB Camp Lejeune.[62]  Over 60% of the cohort reported negative or very negative experiences.[63]  The categories of complaints tracked those of the Plaintiffs.[64]

71.     Lend Lease and Winn conspired to promote inaccurate satisfaction metrics to shield their practices from discovery by the government and encouraged tenants to believe a complaint against them was a complaint against chain of command.  These facts were discovered only after investigative reporting, GAO investigation and public outcry caused Congressional action.

72.     During the class period, Defendants obtained performance bonuses and incentive payments based on touting inaccurate and unreliable satisfaction survey data.

### c.  *False and misleading repair and maintenance data.*

73.     During the class period, had military authorities wanted to audit repair and maintenance records to understand the scope of the problems, they could not have done so.  In 2019, the GAO found that the top five privatized providers, including Lend Lease/Winn, maintained records regarding repair and maintenance work that were so unreliable that a proper audit could not be conducted.

74.     This GAO finding of unreliable repair and maintenance records is consistent with other available information regarding Lend Lease recordkeeping.  For example, with regard to

---

Satisfaction with Military Housing Are Bogus, GAO Says, December 3, 2019, Military.com, available at https://www.military.com/daily-news/2019/12/03/surveys-showing-high-satisfaction-military-housing-are-bogus-gao-says.html.

[62]The data showed that 190 respondents at Lejeune reported a negative experience with the Defendants, while only 46 reported a positive experience.  *See* M.B. Pell and Joshua Schneyer, Survey shows U.S. military families far more negative about housing than landlords claim, Reuters, May 22, 2019, available at https://www.reuters.com/investigates/special-report/usa-housing-map/.  See also MFAN 2019, available at https://militaryfamilyadvisorynetwork.org/wp-content/uploads/FINAL-report-5.20-_FOR-RELEASE_5_22.pdf.

[63] MFAN 2019.

[64] *Id*., p. 156.

MCB Camp Lejeune, an AMCC manager admitted in a November 26, 2013 deposition, that maintenance and repair personnel engaged in a variety of improper practices including "sandbagging," i.e., "writing down 45 minutes at the same house when you don't even go in."[65] After the local AMCC manager "wrote up" the repair and maintenance worker for "[p]adding his time sheet," recommending he be disciplined, "it got killed at Quill's desk," i.e., the regional manager at the AMCC office in Tennessee (John Quill) rescinded the disciplinary request.[66]

75.     Defendants have a motive not to discipline employees for generating false and inflated time records because they allow greater revenue.  The flip side is that if the records are false and inflated and the work is not getting done, the servicemember tenants suffer from inadequate repair and maintenance service.

76.     During the time period that Lend Lease has performed under the ground lease and operating agreement for MCB Camp Lejeune, it has also engaged in inaccurate recordkeeping practices at other projects.  In 2012, a Lend Lease U.S. subsidiary entered into a deferred prosecution agreement with the U.S. Attorney's Office for the Eastern District of New York and the New York County District Attorney's Office in which the Lend Lease entity admitted to "fraudulently overbilling clients for over 10 years"[67] for labor that did not occur.  As alleged in the felony information filed in court, the Lend Lease entity "intentionally and fraudulently billed clients, from at least 1999 to 2009, for hours that were not worked."[68]  The government also alleged that a Lend Lease superintendent "explicitly and fraudulently directed his subordinates to carry

---

[65] *Hess*, Doc. 32-8, pp. 7-9, Kent Sullivan depo. 84:12-88:5.

[66] *Id*.  Nor did AMCC terminate repair and maintenance workers for poor work – "The company was very lenient when it came to actual quality of work, overall. I know of no one that was terminated due to quality of work." Sullivan depo. 95:1-4, *Hess* Doc. 32-8.  Given as AMCC only paid its repair and maintenance workers menial wages of $28,000 or less (*see Hess* Doc. 32-3), it is unsurprising that the company held them to low standards.

[67] U.S. Attorney's Office, E.D.N.Y., press release, Construction Giant Lend Lease (F/K/A Bovis) Charged with Defrauding Clients in Three Separate Schemes – Will Pay over $50 Million and Institute Comprehensive Reforms, April 18, 2012, https://www.justice.gov/archive/usao/nye/pr/2012/2012apr24.html.

[68] *Id*.

24

out the practice of adding unworked hours to labor foremen's time sheets."[69]   The deferred prosecution agreement required Lend Lease to pay up to $56 million in penalties to the federal government and restitution to victims.  Overbilled projects included the September 11 memorial, Grand Central Station, New York Mets stadium, New Jersey schools, and court buildings in the Bronx and Brooklyn (including the courthouse where the case was heard)."[70]

77.    As another example of this practice, in March 2015, Lendlease (US) Construction, Inc., as general contractor, and its subcontractor Cindell agreed to pay $400,000 to the U.S. government to resolve a False Claims Act claim that their subcontractors "underpaid workers and failed to compensate the workers properly for overtime hours despite certifying compliance on weekly certified payrolls"[71] at a project in Virginia.

78.    During the class period, Defendants obtained performance bonuses and incentive payments for work at Lejeune based on inaccurate and unreliable repair and maintenance data.

### *d.  Poor employee training and pay, improper bonuses.*

79.    During the pertinent times, one or more outside service and maintenance vendors have complained of Defendants seeking to cut payments to them past the point where they could provide effective service, and of Defendants seeking to terminate them due to their cooperation in investigations of purported kickback and overcharge practices by the Lend Lease entities at Tri-Command in South Carolina, which during the pertinent times shared one or more managers with the MCB Camp Lejeune project, such as Jim Ferenczy and B.J. Cozart.

---

[69] *Id.*

[70] *Id.*

[71] *United States ex rel. David Ridley v. Midasco, LLC,* No. 1:12-cv-1170-AJT-TCB, E.D. Va, Complaint filed May 3, 2013 (Doc. 7); *see* U.S. Attorney's Office, E.D. Va., press release, Settlement Reached in Patriots Park Renovations Civil Case, March 11, 2015 ("Lend Lease Construction, Inc., a global company locally based in Rockville, Maryland, and Cindell Construction Company, based in Frederick, Maryland, agreed to pay a total of $400,000 to settle False Claims Act allegations in connection with an agreement to perform construction work to renovate a property the government is currently leasing in Reston, Virginia known as 'Patriots Park.'"). https://www.justice.gov/usao-edva/pr/press-release-8.

80.     During the pertinent times, Defendants paid repair and maintenance employees low amounts and gave them little training.  Circa 2011, maintenance technicians and "com" (change of occupancy maintenance) workers were given basic checklists or punchlists to follow and were paid, for example, $14.35 for a worker who had been there three years.   Much of the management of the workers was performed remotely by managers in the Winn headquarters in Boston or the regional office in Tennessee.  The workers had no special training in mold detection or assessment. Defendants had a financial incentive to direct work orders to their own employees, who lacked special mold assessment skills or tools, rather than pay outside vendors who may have those skills, under the financial arrangements for the military housing project.

81.     The "WinnResidential Executive Committee" paid bonuses based on metrics such as the "Rating for INSITE survey program," which was a biased and unreliable customer survey programs.  Under the rules of "WinnResidential military housing services," employees were to maintain productivity goals of ten or more service visits per tech per day, making it virtually impossible to give families complaining of water intrusion, mold, HVAC or other problems anything more than superficial "band-aid" attention.

82.     Winn used many of the same forms, metrics and systems for property management at MCB Camp Lejeune that it used at other non-military projects.  This fact reflects that Winn was applying its own rules and policies, for which it was responsible.  A comparison of the data for military and non-military projects allowed Winn, but not others, to know the comparative neglect of the service it gave at MCB Camp Lejeune compared to other projects.

### 4.  Congress investigates, Defendants admit unacceptable housing.

83.     After the conditions at MCB Camp Lejeune and other bases grew intolerable, military families pled for help.  The Reuters news agency published award-winning[72] investigative reporting on the subject. Outraged, Congressional leaders calendared hearings, including in 2018, 2019 and 2020.  At the hearings, elected representatives and the public heard testimony from military family members who bravely went public despite threats of intimidation and retaliation. They provided graphic and disturbing testimony about mold exposure, pest infestations, water intrusion, rude and dismissive house management, and ineffective oversight.

84.     During a hearing to receive testimony on the current condition of the Military Housing Privatization Initiative, before the Subcommittees on Personnel and Readiness and Management Support, Committee on Armed Services, United States Senate, on February 13, 2018, Denis Hickey, CEO of Lendlease Americas, was asked: "do you affirm today that you will do everything in your power to immediately address the issues raised today by our military families, not just those who testified but also by each of those who submitted testimony and information to the committee?"  His answer under oath was "Yes, sir."  However, the experiences of the Plaintiffs reflect that such has not occurred as their facts extend past February 2018.

85.     More recently in March 2020, Mr. Hickey admitted to "living standards that were clearly unacceptable, and which required immediate attention."[73]  However, the "unacceptable" conditions have continued to occur.

---

[72] Reuters series 'Ambushed at Home' wins National Press Club Award, July 26, 2019, available at https://www.reuters.com/article/rbp-npc2019/reuters-series-ambushed-at-home-wins-national-press-club-award-idUSKCN1UL20M.

[73] Statement for the Record, by Denis Hickey, Chief Executive Officer, Lendlease Americas Inc., to the House Appropriations Committee, Subcommittee on Military Construction, Veterans Affairs and Related Agencies, March 3, 2020, at p. 1:  "This inquiry revealed certain living standards that were clearly unacceptable, and which required

86.     Other reports have also documented the unacceptable conditions.  On October 14, 2016, the Office of Inspector General ("OIG") issued a report to "summarize and analyze previous … health and safety inspections of DoD-occupied facilities and military housing."[74]   One "objective was to identify common issues and broader findings."  The OIG findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative maintenance and inspections being performed at the installations. As a result, DoD personnel and military families were exposed to health and safety hazards at installations around the world."[75]   "These systemic problems resulted in increased health and safety risks to service members."[76]   The OIG summarized prior reports finding "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."[77]

87.     In the fiscal year 2019 Defense Appropriations Act, Congress included a provision asking GAO to review performance under the MHPI.  Congress was increasingly hearing from servicemembers and their families who were very concerned about the condition of their privatized homes, complaints about things like mold and pest infestation, and a concern that the problems were growing worse.[78]

---

immediate attention. Over the past year, Lendlease has reflected deeply on its performance."  Available at https://www.congress.gov/116/meeting/house/110611/witnesses/HRG-116-AP18-Wstate-HickeyM-20200303.pdf.

[74] Summary Report - Inspections of DoD Facilities and Military Housing and Audits of Base Operations and Support Services Contracts, Department of Defense Office of Inspector General, DODIG-2017-004, October 14, 2016. ("2016 OIG Report").

[75] *Id.*

[76] *Id.*

[77] 2016 OIG Report, findings, p. 6.  It noted that "[i]n addition to the critical mold-related deficiencies in Report No. DODIG-2014-121, we also documented mold-related problems in all three of the reports that included environmental health and safety inspections (Report Nos. DODIG-2015-013, DODIG-2015-162, and DODIG-2015-181)."  *Id.*  Of those reports, DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, surveyed three installations in the Southeastern region of the continental United States—Patrick Air Force Base (AFB), Naval Station (NS) Mayport, and Fort Gordon.  DODIG-2015-162, Continental United States Military Housing Inspections – National Capital Region, surveyed two installations in the United States National Capital Region—Fort Belvoir and Joint Base Anacostia-Bolling.

[78] https://www.gao.gov/assets/710/705509.txt (accessed 8/21/20).

88.     In March 2020, Elizabeth Field, a Defense Capabilities and Management Director with the GAO, stated that when her group investigated tenant complaints as to privatized military housing, "we really found problems related to privatized housing at every location that we visited."

89.     When the GAO held meetings and focus groups with servicemembers and their families, they found that some members of the military had decided they were going to get out, because they were not confident that their home was clean and safe. Other servicemembers said that even though they were going to stay in military service, the amount of time and turmoil that they have gone through to deal with the companies that manage their privatized homes has really had an impact on their ability to focus on the job at hand.[79]

90.     Since taking control of housing at MCB Camp Lejeune, Defendants have received numerous complaints and repair requests, including those from Plaintiffs and other members of the class, evidencing the defects in the housing. However, Defendants have systematically failed to promptly and permanently repair and remediate the housing.

91.     With regard to water intrusion and mold, the Defendants' failures have caused a reasonable fear among servicemember families that they have suffered mold-related illness and adverse health effects. Defendants have refused to offer medical monitoring.

92.     As a result of Congressional investigations and hearings, Lend Lease has promised to take steps to remedy the unacceptable and intolerable conditions. The steps the company has outlined boil down to establishing a credible repair, service and maintenance facility, like it has promised before but did not provide, and replacing the unfair and deceptive tenant satisfaction surveys, which it calls "customer service analytics.[80]

---

[79] https://www.gao.gov/assets/710/705509.txt (accessed 8/21/20).
[80] See Hickey testimony before the House Armed Services Committee-Subcommittee On Readiness, Dec. 6, 2019 (promising that Lend Lease is investing in staffing changes; adding new staff, suppliers and contractors; improving training for maintenance personnel to improve skills; improving service order processing; using new mold protocols;

93.     These changes necessary to remedy intolerable and unacceptable conditions should have occurred years ago.  However, Defendants have failed to refund BAH amounts or otherwise compensate servicemember families injured and damaged by the unacceptably poor residential conditions to date.  Nor have Defendants offered other remedial measures to servicemember families, such as paying for medical assessment or monitoring for mold-exposed families.[81]

**B.  Facts Regarding the Plaintiff Families.**

**1.  1st Sgt Scott and Lindsey Johnson.**

94.     1st Sgt Scott A. Johnson is a career member of the United States Marine Corps.  He joined the Marines in 2002.  Lindsey Johnson married Scott in 2006.  They have three minor children, as of mid-2020, ages 5, 9 and 11.

95.     In July of 2015, the Johnsons applied to rent family military housing on MCB Camp Lejeune from Defendants.  They arrived in August of 2015 and stayed in a hotel for two months while awaiting a home that met their needs.  They checked out of the hotel but before they could move into their assigned home, which was a single-story, it was broken into and vandalized with a fire extinguisher.

96.     The Johnson family moved into a temporary home while the other home was cleaned.  However, after cleaning when they inspected, it still had residual fire extinguisher chemicals.  Therefore, they remained in the temporary home while another home was found.

---

implementing technology changes including a "resident app," for maintenance tracking; investing in digital technology; improving "customer service analytics;" etc.).

[81] At one or more hearings, representatives have urged Lend Lease and other privatized housing providers to offer medical compensation to families who have experienced long-term effects of living in properties with environmental hazards, when the fault of the conditions are a direct cause of the provider.  However, they have declined to do so.

30

97.     On October 23, 2015, 1st Sgt Johnson executed a Form Lease for a two-story duplex. The lease listed Atlantic Marine Corps Communities, LLC as the property owner and AMCC Property Management, LLC as the property manager.

98.     The family moved into the home, at 7061 Omaha Road, in a new phase of the Knox Landing development on the New River.  The home reflected a generic floor plan available for 1st Sgt Johnson's rank, in the E6 to E9 category.[82]  The floor plan is known as the Keith.[83]

99.     The home was built near the waterline, on soggy ground that tended to flood when it rained.  The home was susceptible to water and moisture intrusion.  Within a few months, the Johnsons began to notice serious issues with the home.  The foundation began to crack and leak. The side yard would pool with water against the foundation when it rained.  The family documented the problems with photographs:



---

[82] https://www.lejeune.marines.mil/Offices-Staff/Family-Housing-Division/Housing-Areas/ (accessed 8/21/20).
[83] https://cl.atlanticmcc.com/tarawa-terrace/camp-lejeune-new-river-jacksonville-nc/ (accessed 8/21/20).

31

100. Consistent with the above-noted GAO report findings, Defendants' service records for 7061 Omaha Road are inaccurate and incomplete. However, even in their incomplete form, they reflect that through 2019, Defendants logged numerous service calls related to water intrusion and water damage to the home's kitchen, laundry room, wiring and electrical outlets. Specifically, after Hurricane Florence occurred in 2018 and not until sometime after June 2019, there were no work orders inputted.

101. The family documented how water accumulated within a ceiling light and corroded the fixture:

 

102. Water ran out of the screws of the shelves affixed in the laundry room as well as the electrical outlet in the wall:

 

103.    Where the water intrusion occurred at some of the windowsills and electrical outlet

areas, mold later followed:



104.    Water ran into the home from under the bottom of the master bedroom windowsill:



105.    Over time, the Johnsons noticed the water entering at the bottom of the front door

frame and coming out of the electrical outlet under one the windowsills in the master bedroom.

They requested that Defendants eradicate the mold from their home.  However, over and over

again, AMCC was unwilling or unable to determine and resolve the root cause.[84]

---

[84] *See, e.g.,* work ticket entries for 7/11/16 ("black mold"), 9/27/16 ("mold (again)"), 6/1/17 ("mold growing from the vent over the shower on the ceiling of the master bathroom"), 6/26/17 ("mold/mildew is back inside the master bathroom, now it is spreading down the wall").

106.    During the Johnsons' residency, mold appeared in the bedrooms, the kitchen, one or more closets, bathrooms, around windowsills, and around one or more electrical outlets.[85]  The mold conditions were contemporaneously documented in photos:

 



107.    The window in the master bedroom became an increasing concern.[86]    The windowsill rotted so that it could be moved and lifted, and the mold was clearly visible.  When

---

[85] *See* work ticket entry for 3/16/17 (mold around the refrigerator), work ticket entry for 11/6/17 ("mold on everything in master closet"), in other bathrooms (work ticket entries for 9/21/17 and 6/9/19 (referencing "asbestos" which was black mold under the bathroom floor tiles), work ticket entries for 6/29/18, 7/31/18, 8/8/18, 2/25/19 (around window sills and an electrical outlet under one of the windows).
[86] *See* work ticket entry for 2/25/19.

Defendants replaced the window, black mold coated the interior of the original window frame, as shown in photos:

 

108.    In August of 2017, water started to come out of the microwave area.  Lindsey Johnson inspected the area and found mold and water invasion and damage in the cabinet over the microwave.  She called the AMCC maintenance number regarding the microwave, but the representatives stated that the mold growths were "normal" and left without making repairs.

109.    In October to November 2017, Defendants' personnel came back and attempted to repair the microwave area, again, on information and belief only after other neighbors in the housing development began reporting the same issue with their microwaves.[87]

110.    One neighbor told Lindsey Johnson that she had already had two microwaves replaced, and her cabinet collapsed from water damage.  When personnel came to work on the Johnsons' microwave area, they merely removed the microwave and cabinet and wiped the area down.  No effort was taken to quarantine or contain any mold or mold spores.  The personnel then re-installed the contaminated microwave appliance into the repaired cabinet.  The family kept photographic evidence to document what occurred:

---

[87] *See, e.g.,* work ticket entries for 10/6/17 and 11/1/17.

 

111.   Water intrusion affected other parts of the house's electrical system.  Scott Johnson noticed mold on the prongs of a phone charger, so he removed the outlet cover and discovered mold and water in the electrical box.  The Johnsons complained to Defendants about the danger. Defendants' personnel came out and looked at the outlet, took photographs, wiped down the exterior, called the manager, and then left without opening up the outlet or surveying the invasion of water and mold behind the wall.

112.   The Johnsons called the Fire Department and base safety personnel, who responded and advised that the water in the electrical outlet was a dangerous situation.  No further remedial action was taken, however, as both the Fire Department and base safety personnel deferred to Defendants, who in turn failed to remediate the water intrusion into the electrical systems.  Instead, the personnel advised the Johnsons to not let their daughters plug anything into the outlets.

113.   As the water invasion recurrently returned and advanced, lights in the home began to flicker and light bulbs would suddenly burn out.  Again, the family complained, but the repair and maintenance service continued to be inadequate.[88]

---

[88] *See* work ticket entries for 6/6/16, 8/16/17, 11/21/17, 5/18/18, 8/1/18, 2/25/19.

114. The home also had problems involving insects and rodents. Despite repeated visits and treatments, these vermin invasions continued without adequate root cause assessment or abatement.[89]

115. Another recurring problem, likely related to the water invasion issues, were the repeated false alarms from the home's smoke detectors.[90] In addition, over time, the ceiling sprinklers in the children's bedrooms began to bulge and fall out of the sodden ceilings.[91]

116. The foundation of the home began to shift and displace in the soil. A gap of approximately two to three inches appeared between one child's bedroom wall and the adjoining garage wall. Defendants merely applied firewall caulk to the gap.

117. As the house continued to shift, the gap reappeared, and a draft of air from the outside could be detected in the child's bedroom. The gap also was visible from the garage, along with evidence of termite activity and stains from water intrusion.[92]

118. The repeated alarms from the smoke detectors, flickering lights, insects and rodents, and the gap in the exterior wall impaired the children's ability to sleep. They would wake up crying. They were also being exposed to mold.

119. In the Fall of 2018, Defendants belatedly decided to open up the front of the home for repair work. They asked the Johnsons to move all their furniture to the rear of the home and temporarily leave. Repairs were interrupted when Hurricane Florence came in September 2018. The family had to stay away from the home.

---

[89] *See* work ticket entries for insect treatment on 10/26/15, 1/7/16, 3/7/16, 4/21/16, 6/8/16, 6/16/16, 7/5/16, 8/9/16, 8/23/16, 9/28/16, 11/15/16, 2/22/17, 4/5/17, 5/17/17, 6/1/17, 8/16/17, 9/26/17, 11/21/17, 3/2/18, 3/14/18, 4/19/18, 6/5/18, 8/13/18, 11/17/18; work ticket entries for rodents on 4/30/16, 6/18/16, 7/5/16 ("baby mice"). 5/17/17.
[90] *See* work ticket entries for detectors on 5/28/16, 5/9/17, 7/10/17, 8/21/17, 11/11/17, 1/9/18, 5/17/18, 6/9/18, 7/27/18, 8/9/18, 10/6/18, 11/19/18.
[91] *See* work ticket entry on 8/1/18.
[92] *See* work ticket entry on 2/25/19.

120.   After the hurricane, the Johnsons returned to 7061 Omaha Road but only to find that the locks had been changed.  When asked, the AMCC representatives said they did not know why the locks were changed and did not have keys.  They could not confirm whether anyone had been in the home, which contained the family's personal property.

121.   The Johnsons moved back into the home, but the repair work was incomplete and inadequate, and the mold and water issues came back and grew worse.  The Johnsons met with Defendants' representatives and others.  At one such meeting, the Defendants' representative, Jim Ferenczy, fell asleep.  At another time, Jamie Miller, a female AMCC representative, berated Mrs. Johnson, saying that one of these days she would need to make an "adult decision."  These and other AMCC representatives also treated the family poorly on multiple other occasions.

122.   Over the months, 1st Sgt Johnson was shocked to find the deterioration in his family's health and well-being.  Over those months, Mrs. Johnson lost as much as 51 pounds and had such severe respiratory issues that she even had trouble walking up a flight of stairs.  During periods of time that 1st Sgt Johnson was in field ops, and not at home for weeks at a time on training, and Mrs. Johnson was left at home alone with the children, the AMCC staff would treat her very poorly, stopping works and stopping communications.

123.   The Johnsons vacated the home in June 2019.

124.   Plaintiffs Mr. and Mrs. Johnson have suffered actual damage in the form of damage to and loss of personal property due to mold spore contamination.

125.   After the mold problems began at the home, the Johnson family members began to suffer from a variety of health issues which they believe have been caused by the mold exposure. They have sought to obtain assessments by qualified medical professionals.  The Johnson family

38

is continuing to obtain assessments of their mold-related exposure and injury from medical providers and reserve the right to bring a mold personal injury claim.

126.   The Johnson family reasonably fears that they have suffered or will suffer illness or injury due to the mold exposure caused by Defendants.

### 2. SSgt Garrett Burn and Kalie Burn.

127.   On August 7, 2018, Staff Sergeant Garrett Burn, pay grade E-6, signed a Form Lease for unit number 6855 in Knox Landing.  The street address of this duplex was 6855 Omaha Road, located near the Johnsons' home.  The lease ran from August 7, 2018 to August 6, 2019, and after the expiration of the initial 12-month term, it would automatically continue on a month-to-month basis.  The rent amount was the full "BAH with dependents" allotment.

128.   As with the other Plaintiffs, the Form Lease stated that the owner/lessor was Atlantic Marine Corps Communities LLC and the property manager was AMCC Property Management LLC.  The occupants listed on the lease included SSgt Burn, his wife Kalie Burn, and their two children.

129.   The Burns had been together for 12 years at the time they moved to the home.  SSgt Burn had been in the Marine Corps for 12 years as well.  Prior to the relocation to MCB Camp Lejeune in 2018, the family had been in San Diego, where SSgt Burn was stationed as a Marine Corp recruit Drill Sergeant, at Marine Corps Recruit Depot San Diego.

130.   When the family learned that he was being transferred 2000 miles across the country to MCB Camp Lejeune in the summer of 2018, they reasonably believed that the housing at Knox Landing would be safe and allow for reasonable use and enjoyment for their family.  When they moved, that was the first time that the family had ever resided in any of Defendants' privatized housing projects during SSgt Burn's decade-plus of service.

39

131.    The Burn family moved into the residence at 6855 Omaha Road in August 2018 with their young son and daughter, both under age ten.  The Hurricane Florence weather event occurred in September 2018 soon after.  Given as their home was located near the water, on low-lying land, the hurricane led to a great deal of standing water and moisture, especially in the back yard.  Defendants left a flyer on the front door indicating that they would come to inspect the home for damage immediately after the hurricane.  However, that inspection did not happen.

132.    In approximately summer 2019, the Burns began experiencing issues with the fire alarm triggering at odd hours, for no apparent reason.  Defendants were notified about this recurring problem many times but was unable to repair it.  The problem lasted at least six months, at which point the Burns disabled the alarm. The issue is still not repaired today, and the home does not currently have a functioning fire alarm system.

133.    In July 2020 the family noticed that the HVAC unit was dripping water onto the filter.  The unit is located outside, in a small closet-like structure.  When the Burns went to change the filter, it was damp.  They contacted Defendants, who inspected the HVAC unit a few days later.  Defendants unclogged the drainpipe but did not fully inspect or repair the problems.

134.    Sometime after discovery of the HVAC issue, the family started to see mold under the molding of their windows upstairs, in the children's bedrooms.  They then discovered mold underneath other pieces of molding in the home, around virtually every window.  Many of the windows also exhibited visible signs of water intrusion or damage.

135.    This photo shows the window molding in the area of their son's bedroom in July 2020, which was about two feet from the child's bed:

40



136.  The photo below shows the window molding in their daughter's bedroom:



41

137.   The Burns also discovered that the vents located in the ceilings of their downstairs living room and dining room had mold located around the vents, as per this photo from July 2020:



138.   When Plaintiffs called the AMCC property management office, they sent a service person.  But all that the service person did was take the molding, which had already been removed by the Burns, out in the front yard, spray something on it, then pop it back on.  There was no effort to look for the root cause of the moisture intrusion that was causing the mold, so as to prevent it from cropping up again.

139.   Finally, the family at its own cost hired a contractor to inspect for mold.  In July 2020, he confirmed the presence of mold spores including in the kitchen.  After that, Defendants sent their own mold assessment vendor.  He did a moisture reading by the windows in the rooms using a small handheld device.  Defendants called it a moisture problem, not a mold problem.

140.  When the Burns received their own written mold inspection results, they shared them with Defendants.  When the Defendants did their own inspection, Defendants did not share their written results with the family.

141.  Finally, and only after the family incurred the out-of-pocket cost of hiring their own mold professional, Defendants moved the family to a "hospitality suite," while they performed remediation work.

142.  The "hospitality suite" was a run-down housing unit in the Berkeley Manor development.  The first night there, as Kalie Burn was cooking dinner, she reached to get a drinking glass down from the cupboard, and there was live cockroach in the glass.  She later found roach droppings all over the counter, old roach traps in the cabinets, and more live roaches.  The family remains as of the date of this filing tenants in the "hospitality suite."

143.  In early September 2020, the Burns noticed mold on the frame of the front door at the "hospitality suite."  They also found soft spots in the ceilings of the master bedroom and their son's bedroom, apparently due to water intrusion.  Below is a photo of the mold in the door frame:



144.  The Burn family has also experienced a recent late-night fire alarm which was triggered for no apparent reason in the "hospitality suite."

43

145.    During the time since they moved into the Defendants' military housing, SSgt Burn was deployed for six months in Japan, returning to MCB Camp Lejeune in February 2020.  Kalie Burn, while attending to the children, has also sought to manage her salon business in Hubert, NC.

146.    On August 20, 2020, the family's mold expert returned to the home and conducted additional testing.  He found moisture and humidity throughout the home, and the presence of mold at elevated levels. The same day, Defendants visited and took readings. Plaintiffs' understanding is that Defendants confirmed the presence of moisture and humidity throughout the home; found mold in the kitchen cabinetry; found the HVAC system had malfunctioned; but did not determine the root cause of why mold was present.  Subsequently, on Friday, August 28, 2020, Defendants sent a vendor again inspect and test for mold in the home.

147.    The family members have experienced health issues and adverse effects which they believe have been caused by the moldy conditions of the home.  The family has a reasonable basis to be concerned regarding the ill health effects associated with the conditions of the home.

### 3.   Cpl William Lewis and Lakin Lewis.

148.    Corporal William Lewis is a career member of the Marine Corps.  He was most recently deployed starting in December 2019 with the 26th Marine Expeditionary Unit.

149.    William and Lakin Lewis were married in August 2019.  They have one child, a boy, who as of mid-2020 was three months old.  He was born after they moved in.

150.    After William and Lakin Lewis applied to rent military housing at MCB Camp Lejeune, Cpl Lewis executed the Form Lease on October 9, 2019.

151.    The Lewises moved into the unit at 1237 Monarch Court in October 2019.  The unit is in a four-unit building in the Tarawa Terrace community:



152.   Lakin was five months pregnant with her first child upon move-in and was excited to get her new residence prepared for the arrival of the baby.  The day she moved in, there were dead roaches all over the living room, and when she woke up the next morning, there were two live roaches in the kitchen sink.  She always kept a clean house and had never had roaches in one of her homes before to her knowledge.

153.   Over the course of the following days, Lakin noticed black pellets on the kitchen counter and in the cabinets each morning. She cleaned them, but worried that there may be some sort of pest infestation.  Lakin researched the issue further and discovered that the black pellets were consistent with roach droppings.



45

154. The Lewis family reached out to Defendants' property management office for help but were rebuffed and told it was the family's fault. Defendants' personnel suggested a multitude of reasons that avoided Defendants taking responsibility and action. Lakin dealt with a continuing roach infestation due to Defendants' failure to maintain the building interior, exterior and common areas. She was pregnant and her husband was deployed.

155. In the first months of 2020, Lakin continued to complain of the roach infestation, which Defendants did not correct. She continued to document the infestation problems:



156. The roaches would crawl past Lakin's three-day-old newborn baby's bottles, which worried her since roaches carry diseases that newborns are not vaccinated against until they are two months old, and they are not fully vaccinated until after a year.

157. Lakin reached out to the AMCC management office in March 2020, when her son was born, and was told that the roaches were not an emergency and they would not spray but they could come spray for bees.

158. With the roach infestation continuing, a new problem arose when the weather began to warm up. Lakin noticed that the house was unreasonably hot even with the air conditioner running. Throughout the day, and into the night, with the air conditioner running, the temperature in the upstairs of the house remained at approximately 80 degrees, throughout the day and late into

46

the night.  Although the downstairs was cooler, the Lewises did not want to sleep there due to them waking up with roaches on them, which happened more than once.

159.   The high temperatures caused aggravation and unreasonable impairment of the family's ability to use and enjoy their property as leaseholders.  Lakin would try to keep track of the defective air conditioning and her baby at the same time, and documented the facts:



160.   The temperatures were so high around the July 4, 2020 holiday that the Lewises had to stay somewhere else.

161.   Investigating this issue, Lakin discovered that while some of the supply registers[93] appeared to function, others did not.  While the ones that functioned pushed out air, it was not enough to cool down the rooms, so the unit stayed at an elevated temperature.  The registers

---

[93] I.e., the air ventilation grilles with moving parts, capable of being opened and closed, part of the HVAC system.

47

upstairs in the master bedroom and bathroom were not operating at all, and the ones in the spare bedroom and nursery barely and any airflow.

162.    Thus, in the early months of 2020, Lakin was taking care of her newborn baby, with her husband deployed and gone, in a unit infested with roaches, with an HVAC system that did not function properly, and with Defendants' customer service system that was adversarial and unresponsive.  She was constantly concerned about the temperature in her baby's room and stored his bottles and other items in plastic bags due to roaches in the cabinets.

163.    When Lakin communicated with Defendants' representatives, she was treated with disrespect and indifference.  Eventually, she managed to get them to take some action to address the roach infestation and the HVAC issues.  However, these efforts were unsuccessful.

164.    First, Defendants said there was no roach infestation.  Then, they said that even if there were one, they would not move the family.  Then, they sent personnel to treat the residence for roaches, by spraying and placing roach traps.  Despite finding roaches in the traps, maintenance personnel said there was no issue with roaches.

165.    In July 2020, a pest vendor advised that all of the service calls for Defendants' properties were limited to 15 minutes.  He added that the time limit was inadequate to fully treat the home for roaches.  Lakin continued to document the insect infestation:

 

166.    As with the insects, when Lakin complained about the HVAC problems, AMCC attempted to place the blame on her.  First, they said she must have had the vents closed.  Then,

that she must have not had the windows closed. Or was leaving the wrong doors open. These were baseless attempts to shift blame away from the landlord and exhaust the tenant.

167. Defendants told Lakin she couldn't leave her front glass storm door open as it was causing the upstairs to heat up.

168. When Lakin was 38 weeks pregnant, Defendants blamed the roaches on the fact that Lakin didn't move the stove out to clean behind it, although she physically could not move it. Lakin would sweep, mop, and clean around it without any help.

169. Defendants also told Lakin that the roaches were coming from the two bags of clean baby clothes given to her that were sitting next to the washer and dryer when, in fact, the electrical plug behind the stove had a huge hole which led to the outside where the roaches would come in from the common area that AMCC as landlord had a duty to maintain.

170. Different personnel came to the home to attempt to address the HVAC issues. One adjusted the vents, which had no effect. Another said that he himself had installed the HVAC equipment some 20 years ago and that there was nothing wrong, and said words to the effect of "that's as good as it's going to get and you will just have to deal with it." A third maintenance man attempted to make some adjustments to the HVAC unit, which only exacerbated the problem.

171. The unit continued to heat up, alleviated only by cold weather or rain. It made no difference that Lakin set the thermostat at 70 degrees or below.

172. The Lewises have also dealt with mold issues which started in late July 2020.

173. Before Hurricane Isaisas,[94] Defendants came out and sprayed with peroxide and popped two small water bubble areas in the home. Then, approximately two weeks later, a team of people came to the Lewises' home to assess the problem. They discovered a piece of flashing

---

[94] July 30, 2020 – August 5, 2020.

on the roof was missing which was allowing water to get in their home. They said it appeared as though the area with the mold had been repaired before and they wanted to run a scope up there. Later that day, they painted over the spot with microfiber paint. However, they have not gone back to the Lewises' home to run the scope or to replace the missing flashing.

174.   William signed a lease and trusted that Lakin would be in a safe environment while he was deployed, serving our country. Instead, Lakin was forced to deal with uninhabitable living conditions, first while pregnant, and then with her newborn child.

## V.   CONDITIONS PRECEDENT.

175.   All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

176.   Plaintiffs deny that under the circumstances they were obligated to seek to exhaust mediation or any other pre-suit dispute resolution procedures including pursuant to the pre-suit mediation clause found in the Form Lease.[95] However, out of an abundance of caution, the Plaintiffs did, as pre-suit claimants, in good faith seek to mediate the dispute prior to the filing of this action. Those pre-suit mediation efforts included written correspondence, email correspondence and telephone calls with counsel for the pre-suit respondents who are now the Defendants. The dates of those communications included correspondence dated July 2, July 3, July 10, July 22 and July 31, 2020. The mediation demand correspondence was detailed and substantive in nature including, for example, a 22-page letter on July 10, 2020. Counsel for respondents sent responsive correspondence including on July 20, July 28 and August 5, 2020.

---

[95] Form Lease, p. 9.

50

177. Claimants detailed their reasons for finding that pre-suit mediation efforts had arrived at an impasse and further efforts would be futile or actively prejudicial to the claimants, in their letter dated July 31, 2020. Among other things, the respondents declined to share substantive information to facilitate an effective mediation process, failed to engage on the class mediation claim to go along with the individual mediation claims, and failed to respond to the claimants' requests to agree to an interim tolling[96] agreement in order to alleviate the prejudice to absent class members caused by further delay in filing suit.

178. Accordingly, the mediation clause in the Form Lease has been satisfied or has been waived. In the alternative, the current case including its class action claim does not fall within the scope of the parties' mediation agreement.

## VI. NO GOVERNMENTAL IMMUNITY.

179. Defendants are not persons or entities acting under a federal officer so as to give rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity or government contractor defense.[97]

180. None of the named defendants are governmental officials entitled to raise the defense of qualified immunity.

---

[96] *See Womack v. United Parcel Serv., Inc.,* 311 F. Supp. 2d 492, 495-96 (E.D.N.C. 2004) (citing case law on the point that the statute of limitations is tolled, by the filing of the class action, as to all members of the putative class).
[97] *See Bessinger*, 448 F. Supp. 2d 684 (D.S.C. 2006) (involving AMCC housing at Tri-Command, SC; United States was named as a Defendant and noted that AMCC entities were not acting as government's agent); *Thompson v. Campbell Crossing, LLC*, No. 5:16-CV-00169-TBR, 2017 U.S. Dist. LEXIS 5163, 2017 WL 157885 (W.D. Ky. Jan. 12, 2017) (involving Lend Lease / Winn housing at Fort Campbell, KY; denying motion to dismiss that was based on derivative sovereign immunity); *Federico v. Lincoln Military Housing, LLC*, No. 2:12cv80, 2013 U.S. Dist. LEXIS 138613, 2013 WL 5409910 (E.D. Va. Sep. 25, 2013) (Lincoln Military Housing, Norfolk, denying motion to dismiss raising derivative sovereign immunity); *Federico v. Lincoln Military Housing, LLC*, 127 F.Supp.3d 623 (E.D. Va. 2015) (same; summary judgment stage).

181.    With regard to its involvement in one or more AMCC or Lend Lease / Winn privatized military housing projects, the United States has denied that it was controlling, supervising or managing the project.[98]

182.    Defendants are not private individuals engaged in public service, and, the Defendants violated basic landlord-tenant duties and other rights of the Plaintiffs and class members that were clearly established at the time of suit.

183.    Plaintiffs have pled no claim against the government, or one of its departments or agencies, or against a government officer or agent based on the performance of governmental duties, within the scope of sovereign immunity.

184.    Defendants are not entitled to derivative governmental immunity because they violated the government's explicit instructions in the form of the requirements and obligations set forth in the operative agreements, and, the Plaintiffs and class members are persons adversely affected by the violation.[99]

185.    Plaintiffs are not alleging a failure to warn or design defect product liability claim. The government did not exercise its discretion and approve the relevant service, repair and maintenance practices used by the Defendants. Further, Defendants were aware of dangers in their repair and maintenance practices that were known to them but not to the government.

186.    The Defendants' obligations to the government do not conflict with the state law duties alleged herein such that they may not comply with both government and state law directives.

---

[98] *Gillespie v. Actus Lend Lease LLC*, No. 9:10-cv-00120-RMG (D.S.C.), Joint Local Rule 26.03 Disclosures, pp. 1-2 (plaintiff was construction worker injured during revitalization project at the Laurel Bay housing development at the United States Marine Corps Air Station in Beaufort, South Carolina, who sued AMCC-related entities and the United States. Government defendant stated: "The United States denies that it was controlling, supervising or managing the revitalization project."), see also p. 5.

[99] *See Campbell-Ewald Co. v. Gomez*, No. 14-857, 136 S.Ct. 663, 673-74 (2016) ("When a contractor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation.").

187.    Plaintiffs do not argue that the agreements and plans that Defendants entered into with the Navy were defective, but rather, that Defendants did not comply with those agreements and plans or with their own internal plans with regard to the communities.

## VII.    CLASS ALLEGATIONS.

188.    Pursuant to the Fed. R. Civ. Pro. 23(b)(2) and (b)(3), Plaintiffs respectfully request that the Court certify a class defined as follows:

> **Class**:  All servicemember tenants based at MCB Camp Lejeune who have entered into lease agreements with Atlantic Marine Corps Communities LLC for residential housing units from September 18, 2016[100] to present, and all authorized adult family member spouses or other occupants.

Plaintiffs further request certification of two subclasses defined as follows:

> **Three-year subclass**:  All servicemember tenants based at MCB Camp Lejeune who have entered into lease agreements with Atlantic Marine Corps Communities LLC for residential housing units from September 18, 2017[101] to present, and all authorized adult family member spouses or other occupants.

> **Injunctive relief subclass:**   All servicemember tenants based at MCB Camp Lejeune who currently have ongoing lease agreements with Atlantic Marine Corps Communities LLC for residential housing units.

189.    Excluded from the class are Defendants' legal representatives, officers, assigns, directors, successors, and other individuals as is normal and customary in class certification.  Also excluded are all persons who make a timely election to be excluded from the class, in the event of certification of any opt-out class; and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

190.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements.

---

[100] I.e., from four years prior to the date of filing of the complaint.  N.C. Gen. Stat. § 75-16.2.
[101] I.e., from three years prior to the date of filing of the complaint.  N.C. Gen. Stat. § 1-52.

53

Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through review of Defendants' own records.

191.     Fed. R. Civ. P. 23(a)(1) (numerosity):  The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members.  Members may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

192.     Fed. R. Civ. P. 23(a)(2) (common issues):  Questions of law and fact common to the class exist, including, *inter alia*:

A.     Whether, during the class period, some or all of the Defendants were subject to contractual duties under the terms of the Form Lease;

B.     Whether, during the class period, the Defendants breached their contractual duties entered into with Plaintiffs and class members;

C.     Whether, during the class period, the Defendants violated the North Carolina Residential Rental Agreements Act, N.C. Gen. Stat. §§ 42-38 to 49 ("RRAA");

D.     Whether Defendants breached the implied warranty of habitability at G.S. § 42-42;

E.     Whether class members have suffered impairment of their occupancy interest in their leaseholds rising to the level of breach of the warranty of habitability;

F.     Whether Defendants have caused Plaintiffs and class members to experience substantial and unreasonable loss of use and enjoyment of their occupancy interests causing Defendants to be liable for temporary recurrent private nuisance;

G.     Whether, during the class period, the Defendants caused there to be unacceptably bad housing conditions for an unreasonably high number of servicemember families at MCB Camp Lejeune;

H.     Whether, during the class period, the Defendants engaged in unfair and deceptive trade practices in the business of marketing and leasing homes to Plaintiffs and class members at MCB Camp Lejeune, in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq*. ("NC UDAP");

I.      Whether, during the class period, the Defendants engaged in unfair and deceptive service, repair and maintenance policies and procedures with regard to the residential housing at MCB Camp Lejeune;

J.      whether Defendants overcharged Plaintiffs and class members for repair and maintenance items or obligated Plaintiffs and class members to pay out-of-pocket for services or products for which Defendants should have paid;

K.      Whether the capital expenditures and structural reforms announced by Defendants only after congressional hearings should have been implemented years ago;

L.      Whether, due to the inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members did not receive the rental housing they were promised or that their BAH was for;

M.      whether Plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages;

N.      Whether the circumstances giving rise to a private nuisance are abatable;

O.      Whether the Court should order full or partial refunds or disgorgement of BAH revenues obtained over the class period; and

P.      Whether the Court should award other declaratory, injunctive or equitable relief.

193.   <u>Fed. R. Civ. P. 23(a)(3) (typicality)</u>:  Plaintiffs are members of the putative class. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

194.   <u>Fed. R. Civ. P. 23(a)(4) (adequacy)</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative class, as their interests coincide with, and are not antagonistic to, the other members. Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

195.   <u>Fed. R. Civ. P. 23(b)(1)(A)</u>:  A class action is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

55

196.  Fed. R. Civ. P. 23(b)(1)(B): A class action is appropriate because adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

197.  Fed. R. Civ. P. 23(b)(2):  A class action is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

198.  Fed. R. Civ. Pro. 23(b)(3):  Certification of a class is appropriate because questions of law or fact common to the respective members of the class predominate over questions of law or fact affection only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.  Absent a class action it would be highly unlikely that the members of the class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.  A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

199. <u>Fed. R. Civ. P. 23(c)(4)</u>:[102] In addition, or in the alternative, the certification of a class limited to one or more of the common issues, as to one or more of the claims for relief alleged below, is appropriate, because proof of one or more common issues of general relevance to all class members would substantially simplify their ability to proceed further with individual claims for damages with regard to mold-based personal injury or other claims.

## VIII.   <u>CLAIMS FOR RELIEF</u>

### A.   <u>First Claim for Relief:  NC UDAP.</u>

200.   Plaintiffs re-allege the above paragraphs 1-199 as if fully set forth herein.

201.   This claim is brought by Plaintiffs individually and on behalf of the class.  At all times relevant herein, Defendants were engaged in commerce in the State of North Carolina and are otherwise proper defendants under NC UDAP, N.C. Gen. Stat. § 75-1.1 *et seq.*  Plaintiffs and class members are members of the consuming public as defined by NC UDAP, as they sought to acquire goods and services by lease.  Under North Carolina law, lessees have standing to bring a claim under NC UDAP.

202.   Unfair and deceptive trade practices related to marketing of rental housing to prospective customers and providing landlord and property management services for existing customers are subject to NC UDAP because the rental of residential housing is considered commerce pursuant to N.C. Gen. Stat. § 75-1.1.

203.   Defendants were each directly and materially involved in providing the leased residential housing herein, or in providing property management services, such that each is jointly and severally liable for violations of NC UDAP.

---

[102] Fed. R. Civ. P. 23(c)(4) ("(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

57

204.   Defendants during the pertinent times have engaged in unfair and deceptive trade practices in connection with Plaintiffs and class members including as follows:

a.   By offering, marketing and leasing residential housing to Plaintiffs and class members that had defects and deficiencies far in excess of what was acceptable and reasonable;

b.   By offering, marketing and leasing residential housing to Plaintiffs and class members that had water intrusion and mold contamination incidences far in excess of what was acceptable and reasonable;

c.   By unfairly and deceptively marketing lease offerings as coming with excellent customer service, repair and maintenance, when in fact that was not the case;

d.   By receiving payment in the form of the BAH for Plaintiffs and class members, where the BAH was calculated based on an assumption that it was paying for reasonable and safe housing, when in fact that was not the case;

e.   By conducting, sponsoring or participating in resident satisfaction surveys that were inaccurate and misleading, and by using those inaccurate and misleading surveys to avoid oversight of their unacceptable housing practices;

f.   By maintaining customer service, repair and maintenance records and data that were inaccurate, incomplete and unreliable, and by using that inaccurate and incomplete repair and maintenance data to avoid oversight of their unacceptable housing practices; and

g.   By breaching the implied warranty of habitability, the RRAA, or other law, including as alleged in the other claims for relief.

205.   The conduct of Defendants as set forth herein was against established public policy of the State; was unethical, oppressive, unscrupulous, and substantially injurious to consumers; and had the capacity and tendency to deceive the average consumer.

206.   During the class period, Defendants received numerous complaints and repair requests, including from Plaintiffs and class members.  Many of the conditions complained of were the same unfit conditions identified by prior servicemember tenants of the same properties, units and buildings. Defendants had knowledge of this historical information regarding the rental properties, while the incoming new tenants did not.

207. Defendants, by virtue of their course of administering, leasing, building and repairing units at MCB Camp Lejeune, were uniquely aware of the condition of them, including the unacceptable and unsafe conditions and the existence of conditions likely to cause a substantial and unreasonable interference with the occupants' ability to use and enjoy the leased properties.

208. Nevertheless, Defendants knowingly leased those units to Plaintiffs and class members, marketing and representing the communities to the Plaintiffs and class members as being safe, habitable, and well-serviced by the property managers.

209. Had Plaintiffs and class members known in advance of the actual nature of the Defendants' leasing and property management practices and the actual condition of the units, they would not have entered into the leases on the terms proposed by Defendants.

210. Defendants have used their 50-year ground lease, the disparity in information available to the servicemembers and their families, the lack of transparency afforded to the servicemembers as well as regulators, the servicemembers' weaker economic position, and the limitations on families being able to break the lease and move, to effectively hold Plaintiffs hostage in their leases until they received orders stationing them elsewhere.

211. During the pertinent times, Defendants collected the full amount of the BAH, as income otherwise payable to the servicemember Plaintiffs, giving those Plaintiffs no discount for the size, quality, or condition of their house, nor for the inadequate repair and maintenance.

212. During the class period, Defendants underpaid outside repair, maintenance and service vendors, chose ill-equipped and poorly trained vendors, and imposed limits on the abilities of outside vendors to engage in repair and maintenance services, such that problems such as moisture intrusion and mold were likely to occur and once "repaired," were likely to recur.

59

213.   During the class period, Defendants engaged in arrangements with outside service vendors and used policies and procedures that resulted in unfairly transferring service, repair and maintenance costs off of the Defendants and onto the Plaintiffs and class members.

214.   Plaintiffs and class members suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive conduct, including out-of-pocket costs for repair, service, maintenance, diagnostic, sampling, mold assessment, or cleaning products, and the overpayment of their BAH rent by comparison with the quality of the homes provided during the class period.

215.   During the pertinent times, Defendants' actions were in or affecting commerce in North Carolina and nationally, and otherwise amounted to unfair and deceptive trade practices, in violation of Chapter 75 of the North Carolina General Statutes.

216.   Plaintiffs and class members have been damaged and are entitled to recover compensatory damages, treble damages and reasonable attorney's fees and expenses.

**B.   Second Claim for Relief: NC RRAA.**

217.   Plaintiffs re-allege the above paragraphs 1-216 as if fully set forth herein.

218.   This claim is brought by Plaintiffs individually and on behalf of the three-year subclass.  During the pertinent times, Defendants had a duty to provide fit and habitable housing under the RRAA and North Carolina common law.[103]

219.   Plaintiffs' and class members' leases are subject to N.C. Gen. Stat. § 42-46.  During all relevant times, Atlantic Marine Corps Communities, LLC was the owner and a contracting party pursuant to the leases and otherwise subject to the coverage of the RRAA.

220.   During all relevant times, Defendants, jointly and severally, acted as the property manager and a contracting party pursuant to the leases, an agent of the owner, or otherwise were

---

[103]  *See Jackson v. Housing Authority of High Point*, 73 N.C. App. 363, 372, 326 S.E.2d 295 (1985) (discussing breach of implied warranty and Residential Rental Agreements Act, G.S. 42-38 *et seq*.).

materially involved in providing property management services under the leases and subject to the coverage of the RRAA.

221. During all relevant times, some or all of the Defendants had actual or apparent authority to perform the landlords' obligations under the leases and the RRAA and did perform such duties, or otherwise were subject to the coverage of the RRAA.

222. During all relevant times, N.C. Gen. Stat. § 42-42(a)(1) required Defendants to comply with the current applicable codes governing residential construction. N.C. Gen. Stat. § 42-42(a)(2) required Defendants to make all repairs and do whatever necessary to put and keep the tenants' premises in a fit and habitable condition. N.C. Gen. Stat. § 42-42(a)(8) required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition after acquiring knowledge or receiving notice.

223. During the pertinent times, Defendants had knowledge regarding the recurrent problems of all of the housing units at MCB Camp Lejeune. Plaintiffs and class members did not. During the pertinent times, Defendants received numerous tenant complaints regarding residential problems and defects. Under the facts and circumstances, Plaintiffs and class members should be deemed to have satisfied any applicable notice requirement for purposes of triggering any RRAA duties that had a notice prerequisite.

224. During the class period, Defendants impliedly warranted to Plaintiffs and class members that the premises available for lease were in fit and habitable condition. In fact, Defendants knew that an unacceptably high proportion of units had mold, insects, defective HVAC systems or other deficiencies. Nonetheless, Defendants held out their privatized housing at MCB Camp Lejeune to be high-quality and safe.

225. The units leased by Plaintiffs and class members have had moisture intrusion, mold, insects, defective HVAC systems and other conditions which threatened the health and safety of family members. Defendants had adequate time to repair and remedy the unsafe and unsanitary conditions after years of complaints and repair requests but failed to make a reasonable effort to repair and remedy the defective conditions.

226. During the pertinent times Defendants violated N.C. Gen. Stat. § 42-42 and the implied warranty of habitability as to Plaintiffs and class members, thereby proximately causing injury to the Plaintiffs and class members.

227. As a direct and proximate result of Defendants' breaches of the implied warranty of habitability, Plaintiffs and class members were injured, and are entitled to damages and declaratory, injunctive or equitable relief to the extent available.

228. Defendants breached their implied warranty of habitability thereby proximately causing damages to Plaintiffs and class members, including out-of-pocket costs, costs representing the labor value of needless time consumed by residents seeking to repair and maintain units themselves, and monies representing the overpayment of BAH rent amounts in whole or in part exceeding the reasonable rental value of the units during the period of occupancy.

**C. Third Claim for Relief: Breach of Contract.**

229. Plaintiffs re-allege the above paragraphs 1-228 as if fully set forth herein.

230. This claim is brought by Plaintiffs individually and on behalf of the three-year subclass. During the pertinent times, servicemember Plaintiffs and class members entered into valid contracts with Defendants in the form of residential leases.

231. The leases and incorporated materials imposed explicit and implicit duties on Defendants, as owners or entities materially involved in providing property management, to

perform the contract so as to ensure the units were fit for human habitation. During the pertinent times, Defendants warranted that units were reasonably safe and habitable for occupancy.

232. During the pertinent times, Defendants failed to comply with the material terms of the leases by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation. Defendants breached provisions of the Form Lease and incorporated materials including by failing to provide adequate repair and maintenance services to residents.

233. On information and belief, the Defendants were directly and materially involved in performing under the lease contracts, or otherwise directly and materially involved on the facts, so as to be fairly held jointly and severally liable for breach of contract.

234. A contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.[104] Defendants here had a duty to act fairly and in good faith in connection with performance under the residential leases herein.

235. Defendants had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the leases including, but not limited to, keeping the units safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendants' vastly more powerful economic position to oppress and intimidate families. During the pertinent times, Defendants breached the implied covenant of good faith and fair dealing.

---

[104] *See Maglione v. Aegis Family Health Ctrs*., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005); *Robinson v. Deutsche Bank Nat. Tr. Co.*, No. 52-CV-590, 2013 U.S. Dist. LEXIS 50797, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (accord).

236.   Plaintiffs sustained damages as a result of Defendants' breaches of contract including the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in an amount to be proven at trial.

237.   As a proximate and legal result of Defendants' breaches of contract, Plaintiffs and class members were injured and damaged, and are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

### D.   Fourth Claim for Relief: Negligence.

238.   Plaintiffs re-allege the above paragraphs 1-237 as if fully set forth herein.

239.   This claim is brought by the Plaintiffs individually and on behalf of the three-year subclass, as an issue class pursuant to Fed. R. Civ. P. 23(c)(4).  During the pertinent times, all of the named Defendants were directly and materially involved in managing the residential leased properties such that each incurred a duty to act with due care to the Plaintiffs and class members with regard to their residential repair, maintenance and property management services.

240.   During the pertinent times, Defendants owed a duty to Plaintiffs and class members to communicate truthful information regarding known defects in their military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs to be informed before entering into leases.

241.   During the pertinent times, Defendants owed a duty to Plaintiffs and class members to respond promptly, effectively, and truthfully to concerns about the condition of the units expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns.

242.   During the pertinent times, Defendants owed a duty to Plaintiffs and class members to faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, the NC RRAA.

243.   During the pertinent times, Defendants owed a duty to Plaintiffs and class members to maintain leased houses in good order and in a decent, safe and sanitary condition and to respond competently and reasonably to requests and complaints of the tenants.

244.   During the pertinent times, Defendants breached their duties as follows with regard to Plaintiffs and class members including by failing to communicate truthful information regarding the housing, by failing to respond promptly, effectively, and truthfully to concerns about the condition of the units expressed by Plaintiffs, including refraining from providing misinformation when responding to said concerns, and by failing to maintain leased houses in good order and in a decent, safe and sanitary condition, both in terms of protecting Plaintiffs and class members from water intrusion and mold, acting reasonably to respond to mold complaints, and otherwise.

245.   Defendants' breaches of duties constitute negligence, gross negligence, negligence *per se*, and/or reckless and willful conduct.

246.   As a proximate and legal result of Defendants' breaches of the duty of care, Plaintiffs and class members have been injured.  Plaintiffs and class members have been injured as a result of Defendants' breaches of the duty of due care.

247.   As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, Plaintiffs and class members were injured and harmed.

248.   Plaintiffs and class members are entitled to an award of damages in amounts to be proven at time of trial.

249. To the extent that Defendants' conduct was undertaken intentionally or with reckless disregard for the foreseeable consequences to Plaintiffs and class members, and the requirements of N.C. Gen. Stat. § 1D-1 *et seq.* have been met by the evidence, Plaintiffs and class members should be awarded exemplary or punitive damages.

### E. <u>Fifth Claim for Relief: Temporary Recurrent Private Nuisance</u>.

250. Plaintiffs re-allege the above paragraphs 1-249 as if fully set forth herein.

251. This claim is brought by Plaintiffs individually and on behalf of the three-year subclass and injunctive relief subclass. The Plaintiffs and class members who occupied the residential units during the pertinent times have standing to bring this claim due to their possessory and occupancy interests.

252. During the pertinent times, the Defendants proximately caused the Plaintiffs and class members to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold properties.

253. As a direct and proximate result of Defendants' creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs and class members have been injured.

254. The nuisance conditions herein are abatable. However, during the class period, Defendants have unreasonably refused to abate them.

255. As a result of the Defendants' creation and maintenance of a private nuisance, the Plaintiffs and class members are entitled to compensatory damages and to injunctive relief in the form of an order requiring Defendants to abate the further persistence of the private nuisance.

### F. <u>Sixth Claim for Relief: Declaratory and Injunctive Relief</u>.

256. Class Plaintiffs re-allege the above paragraphs 1-255 as if fully set forth herein.

257.   This claim is brought by Plaintiffs individually and on behalf of the injunctive relief subclass.  Those Plaintiffs and class members who continue to lease and occupy residential units pursuant to ongoing lease contracts with Defendants are entitled to entry of declaratory relief and for the Court to construe and clarify the express and implied terms of the form lease and declare the respective rights and duties of the parties.

258.   Under the circumstances, Plaintiffs are entitled to equitable, injunctive and declaratory relief specifying and clarifying Defendants' duties to provide adequate and fair customer service, repair and maintenance property management services, under the express and implied terms of the parties' agreements.

259.   During the pertinent times, Defendants knew, or should have known, that the homes in question were non-compliant with applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements.  However, Defendants failed to act appropriately under the obligations imposed by the lessor-lessee relationship.

260.   Under the circumstances, particularly due to the existence of Plaintiffs and class members who are parties to currently ongoing leases, available remedies at law may be in whole or in part inadequate, and injunctive relief may assist to preserve the status quo pending the ultimate resolution of this action.

261.   During the pertinent times, Defendants have collected significant BAH and other income related to providing the deficient residential leased properties to servicemembers and their families.  To the extent not subject to Plaintiffs' breach of contract claim, Plaintiff have conferred a benefit on Defendants which it would be unjust for Defendants to retain in whole or part, and Defendants have been unjustly enriched. In addition or in the alternative to the claims alleged above, Plaintiffs request that the Court order an equitable accounting, refund, disgorgement and

restitution, including to the extent that Defendants' revenues traceable to the Plaintiffs' and class members tenancies exceed the reasonable value of the leaseholds during the pertinent times.

262. Plaintiffs request that the Court enter equitable, declaratory and injunctive relief:

    a.    construing the terms of the form lease agreement and declaring the respective rights and obligations of the parties;

    b.    enjoining Defendants from continuing violations of their duties as landlords and property managers herein;

    c.    awarding relief in the form of appointing a special master or auditor at the Defendants' expense to engage in an accounting and review of pertinent records regarding Defendants' alleged property management practices;

    d.    enjoining Defendants to correct misrepresentations on the websites and in marketing materials or to provide more complete and transparent disclosures to servicemember tenants and their families;

    e.    sequestering BAH payments under Court oversight;

    f.    ordering abatement of the private nuisance;

    g.    awarding disgorgement and full or partial restitution of monies to eligible servicemembers; and/or

    h.    awarding such other declaratory, injunctive or equitable relief as the Court may deem appropriate.

## IX.   <u>JURY DEMAND.</u>

Plaintiffs respectfully demand a trial by jury of all claims so triable.

## X.   <u>PRAYER FOR RELIEF.</u>

**WHEREFORE,** Plaintiffs pray for judgment in their favor against Defendants as follows:

1. For designation of the Plaintiffs as class representatives;

2. For appointment of the undersigned counsel as class counsel;

3. For certification of a class and specified subclasses with regard to the Plaintiffs' stated claims for relief, or, with regard to one or more common issues;

4. For an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

5. For an award of treble damages as provided by N.C. Gen. Stat. § 75-16;

6. For an award of rent abatement, in whole or in part, prospectively or retrospectively; restitution; or disgorgement of the monies obtained by Defendants;

7. For an award of reasonable attorneys' fees and costs under N.C. Gen. Stat. § 75-16.1;

8. For an award of punitive damages to the extent the evidence may show violation of Chapter 1D of the North Carolina General Statutes and proof by clear and convincing evidence of an aggravating factor;

9. For equitable relief to abate a nuisance; and

10. For such other and further relief as the Court may deem just and proper.

DATED: September 18, 2020.

BY:                                    s/Joel R. Rhine
                                       Joel R. Rhine, NC State Bar No. 16028
                                       Martin A. Ramey, NC State Bar No. 33617
                                       Janet R. Coleman, NC State Bar No. 12363
                                       RHINE LAW FIRM, P.C.
                                       1612 Military Cutoff Rd., Suite 300
                                       Wilmington, NC 28403
                                       Phone: 910-772-9960
                                       jrr@rhinelawfirm.com
                                       mjr@rhinelawfirm.com
                                       jrc@rhinelawfirm.com

                                       David Hilton Wise, VA Bar No. 30828
                                       John J. Drudi, VA Bar No. 86790
                                       WISE LAW FIRM PLC
                                       10476 Armstrong Street
                                       Fairfax, VA 22030
                                       Phone: 703-934-6377
                                       dwise@wiselaw.pro
                                       Jdrudi@wiselaw.pro
                                       *By special appearance, Local Civil Rule 83.1(e)*

                                       John A. Yanchunis, FL Bar No. 324681
                                       Kenya Reddy, FL Bar No. 459933
                                       MORGAN & MORGAN LAW FIRM
                                       201 N. Franklin Street, 7th Floor
                                       Tampa, FL 33602
                                       Phone: 813-223-5505
                                       JYanchunis@ForThePeople.com
                                       KReddy@ForThePeople.com
                                       *By special appearance, Local Civil Rule 83.1(e)*

                                       s/John Hughes
                                       Mona Lisa Wallace, NC State Bar No. 009201
                                       John Hughes, NC State Bar No. 22126
                                       WALLACE AND GRAHAM, PA.
                                       525 N. Main Street
                                       Salisbury, NC 28144
                                       Phone: 704-633-5244
                                       mwallace@wallacegraham.com
                                       jhughes@wallacegraham.com